Filed 1/13/15

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

KENNETH GONSALVES,

     Plaintiff and Respondent,

v.

RAN LI,

     Defendant and Appellant.

A140284

(Contra Costa County
Super. Ct. No. MSC10-03516)

Appellant Ran Li crashed a new BMW during a test drive. Kenneth Gonsalves, a salesperson for the BMW dealership, was a passenger in the vehicle. Gonsalves sued, alleging that Li[1] drove recklessly during the test drive, causing the accident, and that Gonsalves suffered significant back injuries as a result. A jury found that Li was negligent, that Gonsalves was not comparatively negligent, and awarded Gonsalves more than $1.2 million in damages. Li argues the trial court committed numerous evidentiary errors and failed to adequately investigate juror misconduct. He further argues that Gonsalves's trial counsel committed multiple acts of misconduct. We conclude the trial court erred in admission of certain evidence and find that Gonsalves's counsel committed misconduct in at least two instances. We conclude that the cumulative prejudice from these errors requires the verdict be set aside and the matter be remanded for new trial.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.A.2–5 and II.B–D.

[1] The original complaint named both Gonsalves and his wife as plaintiffs and both Li and his father, Xiaoming Li (hereafter Xiaoming; no disrespect intended), as defendants. Gonsalves's wife was dismissed as a plaintiff at her request. Xiaoming apparently also was dismissed as a defendant midtrial.

1

# I. BACKGROUND

*Undisputed Facts*

On December 28, 2008, Gonsalves assisted potential customers Xiaoming and Li at a BMW dealership in Concord. Gonsalves accompanied them on test drives of a BMW 335 and of a more powerful car, a BMW M3. Xiaoming drove the first half of the M3 test drive and Li drove the second half. During the M3 test drive, Li exited the highway to return to the dealership, but then pressed an "M button" in the car and returned to the highway. He lost control of the vehicle in the curve of the on-ramp. The car's rear wheels lost traction and the car hit the guardrail, turning to face oncoming traffic. None of the airbags deployed and there were no skid marks. Accident reconstruction experts for both parties agreed that the M3 was traveling at about 25 miles an hour when it entered the curve of the on-ramp, and then accelerated. California Highway Patrol officers interviewed the parties shortly after the accident. Gonsalves reported that the driver had accelerated in a turn, spun the vehicle out, and hit the guardrail. Li reported that, after he exited the highway, Gonsalves told him about the functions of the M button; Li pushed the M button and returned to the highway; and the accident occurred as he accelerated in the curve of the on-ramp.

*Gonsalves's Version*

Gonsalves testified that when Li and Xiaoming arrived at the dealership they expressed interest in test driving both the 335 and M3, but Gonsalves persuaded them to test drive the less-powerful 335. Only Xiaoming drove the 335. When Xiaoming asked if he could test drive the M3, Gonsalves told him the dealership typically only allows "confirmation test drives" of the M3—i.e., test drives after an agreement on price and confirmation of a customer's ability to pay—because purchasers want to buy those cars with no mileage on them. Xiaoming told Gonsalves he lived in Orinda, was wealthy enough to pay cash for the car, and was very interested in buying the car. Because Gonsalves was concerned that he had insulted Xiaoming, he let Xiaoming test drive the M3 without the usual confirmatory paperwork.

2

Xiaoming initially drove the M3 and then asked Gonsalves if his son could drive the car. Gonsalves initially said no, but relented after Xiaoming told him Li was a very safe driver who had never received any tickets. When Li got on the highway, he accelerated to 120 miles per hour and began to weave dangerously between cars. Gonsalves repeatedly told Li to slow down. As Li was returning to the dealership, he asked Gonsalves about various buttons on the dashboard, including the M button. Gonsalves told him not to press the M button. Li accelerated to 60 to 80 miles per hour and headed toward the highway on-ramp—both Xiaoming and Gonsalves told him to slow down—and sometime before he got on the highway on-ramp, he pressed the M button. He told Gonsalves, "I'm just going to get on the freeway and I'll get right back off." As he accelerated into the curve of the on-ramp, he lost control of the vehicle.

According to medical reports, Gonsalves told doctors that he was injured when a test driver accelerated to 120 miles per hour and ran into a wall. In response to an interrogatory, Gonsalves wrote that the car was going about 80 miles an hour on the on-ramp. In a deposition, Gonsalves had said the car was going 50 to 60 miles an hour at the time of the crash. At trial, Gonsalves said he could not estimate the car's speed in the curve of the on-ramp, but he was sure it was traveling faster than 25 miles an hour. He admitted it was not traveling 80 to 85 miles per hour on the on-ramp. Gonsalves testified that he tried to tell the CHP officers about Li's dangerous driving on the highway, but the police directed him to describe only what happened during the accident itself.

Gonsalves's expert testified that the accident occurred because of driver error: the driver accelerated and turned the steering wheel in a manner that caused the car to exceed the maximum friction in the roadway. "This is clearly not a turn where 25 miles an hour is maintained constant through the turn. [¶] . . . [¶] It's 20 or 25 miles an hour starting into the turn and then gunning it and turning the steering wheel hard. That's what caused the accident." The expert acknowledged that the M button might have been programmable to disengage the car's dynamic stability control system, which was designed to automatically direct braking power to wheels that start to slip. He acknowledged that the car might have handled differently with the stability control

disengaged and, because it was unknown how the M button was programmed, it would have been imprudent of Gonsalves to suggest that Li press the M button—such an act might have contributed to the accident. "If the driver thinks he's got more capability than he does, then he may exceed those capabilities." Gonsalves's expert nevertheless opined that the accident was caused by driver error regardless of whether the M button had disengaged the stability control system.

*Li's and Xiaoming's Version*

Xiaoming testified that he went to the BMW dealership because he was interested in purchasing a new car that he would share with Li, who had just finished college and was working in San Francisco. Gonsalves suggested they test drive a 335. He collected driver's licenses from Xiaoming and Li and, per their agreement, Xiaoming drove the first half of the 335 test drive and Li drove the second half. After the 335 test drive, Gonsalves asked if there was anything they did not like about the car and they said they preferred a stick shift. He suggested they test drive a manual transmission M3. Again, per their agreement, Xiaoming drove the first half of the test drive and Li drove the second half. Xiaoming could tell immediately that the M3 was very different from the 335. When Li took over, he drove about 85 miles per hour and passed some cars but he was not "weaving." Xiaoming told him to be careful; Gonsalves said nothing.

Li exited the highway and was about to return to the dealership when Gonsalves said, "Oh, do you want to see the full potential of the car? There's a button. If you press the button, it's going to change the behavior of the car." Gonsalves pointed out the M button and said it would cause the car to stiffen and release a lot of power. Because travel had to be at a sufficient speed to feel the difference, Gonsalves advised them to get back on the highway to try it out. Li rapidly accelerated in the curve of the on-ramp, and the car started moving sideways as well as forward. Xiaoming told Li to be careful, but Li "must have pressed on the brake so hard, [because] then the car was totally out of control. It spun a little bit and hit [the] guardrail." It happened very quickly. "[T]he car had indeed stiffened substantially . . . once the car was in motion with sufficient speed . . . ." Li similarly testified that pressing the M button somehow changed the car's

4

performance "so when I made that turn, a turn that I would typically think was a safe speed, the car lost control." He had had no trouble driving the M3 before the button was pushed. Following the accident, Gonsalves calmly and cordially told Xiaoming that the accident occurred because Li was not used to driving a rear-wheel drive vehicle.

The defense expert opined that pressing the M button affected the way the accident happened. "[T]he Dynamic Stability Control on the vehicle was clearly off when this accident occurred; otherwise, we wouldn't see the rear of the vehicle spinning out or coming out to the left as it did in this accident." When the wheels are spinning, the speed of the vehicle does not increase. Thus, the accident was not caused by excessive speed. Instead, "pressing the accelerator caused the rear wheels to spin, which is what caused the vehicle to lose control. That was all caused by the Dynamic Stability Control being turned off."

*Gonsalves's Injuries*

Gonsalves testified that he was thrown around from side to side and back and forth as the car spun. For years after the accident, he suffered from neck and back pain, had a limited range of motion in his neck, and developed numbness and tingling in his upper extremities. When pain medication, physical therapy and epidurals failed to alleviate his symptoms, Gonsalves underwent artificial disk replacement surgery in May 2013, which provided substantial relief. He anticipated having further surgery on another disk in the future. It was disputed at trial whether Gonsalves's medical problems after the accident were caused by the accident or were normal degenerative problems typical of persons his age.

In closing argument, plaintiff's counsel asked the jury to award $118,643.86 in past medical expenses, $80,518.80 in future medical expenses, and between $744,993 and $1,495,986 in pain and suffering damages. Defense counsel argued Li had not been negligent and that Gonsalves's past medical expenses were overstated, future medical expenses were unproven, and noneconomic damages were in the range of $35,000 to $40,000.

5

*Verdict and Motion for New Trial*

The jury found only Li negligent and awarded Gonsalves $118,642.86 for past medical expenses, $90,000 in future medical expenses, and $1,000,000 in noneconomic damages. The trial court denied Li's motion for a new trial, and entered judgment against Li for $1,208,642.86.

## II.    DISCUSSION

### A.    *Evidentiary Errors*

Li argues the trial court made several errors in admitting evidence and allowing examination on certain subjects. With the exception of one issue of statutory interpretation, we review these issues for abuse of discretion. (*People v. Foss* (2007) 155 Cal.App.4th 113, 124–125.)

#### 1.    *Requests for Admission*

Li argues the court erred in permitting plaintiff's counsel to examine Li about his negative responses to Gonsalves's requests for admission (RFA's) and admitting those responses in evidence. We agree that this was error.

##### a.    *Background*

Gonsalves called Li as an adverse witness during his case in chief. Plaintiff's counsel had Li confirm that he prepared responses to Gonsalves's RFA's and swore under penalty of perjury that his responses were true. The court instructed the jury: "Before trial, each party has the right to ask another party to admit in writing that certain matters are true. If the other party admits those matters, you must accept them as true. No further evidence is required to prove them. However, these matters must be considered true only as they apply to the party who admitted they were true. [¶] So prior to the trial during this discovery process, the plaintiff sent the defendant these Requests for Admissions. Plaintiff's counsel is now asking the witness about those requests. [¶] The other side can do the same."[2]

---

[2] In this case, however, counsel examined Li not about his admissions, but about his failure to make admissions.

6

Plaintiff's counsel then told the jury that Li was asked to admit that "at the time as you began your turn from Concord Avenue onto Highway 242 northbound on-ramp you were driving too fast for the conditions," and that Li replied, "Responding party has a lack of information and knowledge to admit this Request for Admission. A reasonable inquiry concerning this matter has been made, and the information known or readily obtainable is insufficient to enable responding party to admit this matter." Plaintiff's counsel then extensively examined Li on this and similar responses to RFA's over multiple defense objections.[3] When Li testified in the defense case in chief, plaintiff's counsel again asked questions in cross-examination about Li's responses to the RFA's and elicited Li's statement, "I stand by my admissions that I signed."

Defense counsel made at least nine objections that questions about Li's denials of the RFA's were argumentative, that "these are not exhibits in the case," and that the questions called for legal opinions or were contention questions.[4] All of the objections were overruled.

At the conclusion of Li's testimony, the court admitted in evidence the full sets of the RFA's and special interrogatories that asked Li to explain any denials to the RFA's, as well as Li's responses to both.[5] Defense counsel moved to strike and exclude all

---

[3] Excerpts of the examination are set forth in an appendix to this opinion (see appen., *post*, at pp. 35–36).

[4] Defense counsel further insisted that, "[A]ll of these questions violated defendants' motion in limine number 3. That motion prohibited any questioning concerning whether or not the defendant takes responsibility for the accident or took responsibility during litigation."

[5] Defense counsel initially objected to admitting the written responses to the RFA's in evidence. He contended that if responses were admitted, Li's explanations for those responses should also be admitted. Plaintiff's counsel suggested admitting all of the RFA's, responses and the corresponding special interrogatories and responses. Defense counsel asked the court to admit a single form interrogatory propounded by Li and Gonsalves's response, and plaintiff's counsel asked that it be presented in context with all of the other form interrogatories and responses. Defense counsel then said, "I could compromise, Your Honor. It looks like they are putting in all the admissions. If they put in all the admissions . . . and our explanation[s], I don't mind if they all come in. That's not really my biggest problem with the admissions. It was questioning [Li] on it."

7

testimony regarding Li's responses to the RFA's and to admonish the jury to disregard the evidence. The motion was denied.

In closing argument, plaintiff's counsel urged the jury to consider Li's failure, in response to the RFA's, to admit that his pressure on the accelerator was a substantial factor in causing the accident, as evidence of his failure to take responsibility for Gonsalves's injuries. Counsel told the jury, "I encourage you to look at . . . the Requests for Admissions that we sent to Ran Li asking him to admit some very basic facts about this crash. His responses are there as well. Let's just look at a few of them. . . . [¶] . . . [¶] This is a simple question, ladies and gentlemen. 'How much did you push on the accelerator.' [His response] is a bunch of double speak[,] . . . a bunch of 'I'm sorry I'm not taking responsibility and not only am I doing it, I'm doing it in a way that makes no sense.' [¶] . . . [¶] . . . [I]t's been more than four and a half years since this crash, and he will not in any way take any responsibility for it. . . . And that's why we need to impanel a jury like you."

Posttrial, Li renewed his argument that the examinations were improper in his motion for a new trial: "Such questions add no facts to the case, deny the defendant representation, and improperly inflame the jury." The court denied the motion.

b.    *Analysis*

Li argues the discovery statutes do not authorize admission at trial of denials to RFA's and that the trial court erred in allowing plaintiff's counsel to examine him about his qualified denials and in admitting the written responses. We agree.

As a preliminary matter, Gonsalves argues defense counsel implicitly waived any objection to admission of Li's responses when he stipulated to admission of the written responses at trial. As set forth *ante*, however, the defense made this stipulation only after the court had overruled its objections to use of the responses during the examinations of Li and after the court appeared unpersuaded by defense counsel's arguments that the

---

The court admitted the full set of RFA's, the redacted responses, the special interrogatories, and responses.

8

written responses were not admissible evidence. In context, therefore, the stipulation cannot be deemed truly voluntary or an intentional waiver of the objection. (See *Boyle v. CertainTeed Corp.* (2006) 137 Cal.App.4th 645, 650 ["[n]o waiver may be implied where, as here, a party alleging error has made its objection and then acted defensively to lessen the impact of the error"].)

Interpretation of the discovery statutes is subject to our de novo review. (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432.) Li notes that the discovery statutes expressly allow *any part of* a deposition or interrogatory to be introduced at trial (with certain restrictions not relevant here), whereas the statutes only provide that *admissions* in response to RFA's are binding on the party at trial. (Code Civ. Proc., §§ 2025.620 ["*any* part or all of a deposition" (italics added)], 2030.410 ["*any* answer or part of an answer to an interrogatory" (italics added)], 2033.410 ["[a]ny matter *admitted* in response to [RFA's]" (italics added)]; see also Wegner et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2013) ¶ 8:828, p. 8C-104.3 (Rev. #1, 2011) ["[*a*]*dmissions* made in response to [RFA's] . . . may be received into evidence at trial" (italics added)].) Li further notes that the statutory scheme provides for monetary sanctions (i.e., reasonable expenses including attorney fees) when a party unreasonably fails to admit a matter in response to RFA's, but does not expressly permit a denial, objection or failure to respond to RFA's to be used against the party at trial. (Code Civ. Proc., § 2033.420, subd. (a).) He argues that the statutory scheme therefore implies that the only authorized sanction for an unreasonable failure to admit is a monetary award and a denial cannot be used to impeach a witness at trial. In this case, the court actually *denied* sanctions for Li's failure to admit the RFA's, yet the court allowed Li to be impeached with that same conduct. Gonsalves argues that the statutes are essentially silent on the subject of whether denials or qualified denials are admissible at trial, leaving the admissibility subject to the trial court's discretion.

Neither Li nor Gonsalves cites authority that we find to be directly on point. Our own research reveals a somewhat surprising paucity of relevant authority. In *Morris v. Frudenfeld* (1982) 135 Cal.App.3d 23 (*Morris*), the appellant asserted it was error to not

9

permit impeachment of the respondent by showing certain denials to RFA's were inconsistent with respondent's admissions on the witness stand. (*Id.* at p. 35.) Citing Evidence Code section 352, the trial court declined to permit reading of the denials to the jury on the basis of excessive time consumption. Noting that the record was unclear as to precisely what pretrial denials appellant was attempting to introduce, the reviewing court held that such a ruling was within the sound discretion of the trial judge. (*Morris,* at pp. 35–36.) While perhaps implicitly suggesting that admission at trial of denials to RFA's is committed to the trial court's discretion and not precluded by statute, the case does not so hold. The issue presented in *Morris* was whether the court could properly exclude an allegedly inconsistent prior statement. Gonsalves does not allege any inconsistency between the discovery responses and trial testimony. In fact, he argued to the jury that they should draw adverse inferences from the fact that Li *continued* to deny the request, consistent with his earlier responses.

Li analogizes the examinations by plaintiff's counsel to asking a witness to explain the basis of his legal contentions, conduct condemned in *Rifkind v. Superior Court* (1994) 22 Cal.App.4th 1255 (*Rifkind*). In *Rifkind*, the witness was asked at deposition to state with respect to each of his affirmative defenses: "all facts that support the affirmative defense"; "the identity of each witness who has knowledge of any facts supporting the affirmative defense"; and the identity of "any documents that pertain to the facts or witnesses." (*Id.* at pp. 1257–1258.) The Court of Appeal condemned the practice, which it referred to as asking "legal contention questions," but held the same questions could properly be asked in interrogatories. (*Id.* at pp. 1256, 1260.) The distinction between these discovery devices is that " 'the client presumably knows the facts (although not always), but he can hardly be expected to know their legal consequences. This is what lawyers are for.'. . . [Citation.]" (*Id.* at p. 1260.) "[L]egal contention questions require the party interrogated to make a 'law-to-fact application that is beyond the competence of most lay persons.' [Citation.] Even if such questions may be characterized as not calling for a legal opinion [citation], or as presenting a mixed question of law and fact [citation], their basic vice when used at a deposition is that they are unfair. They call upon the

deponent to sort out the factual material in the case according to specific legal contentions, and to do this by memory and on the spot." (*Id.* at p. 1262.)

While not directly on point, we agree that the underlying concerns discussed in *Rifkind* apply to the use of qualified denials to RFA's in the examinations here. Li was asked to explain "by memory and on the spot" and without the ability to consult with his attorney why he took the legal position that he could not admit or deny certain RFA's without further inquiry. And he was asked to do this not in a deposition, as in *Rifkind*, but in front of the jury.

We find that the weight of authority in other jurisdictions also favors Li's position. Massachusetts's highest court interpreted a statutory scheme similar to California's[6] and concluded that denials to RFA's are not admissible evidence at trial: "The purpose of [RFA's] is to narrow the issues for trial by 'identifying those issues and facts as to which proof will be necessary.' [Citation.] A denial . . . is not a statement of fact; it simply indicates that the responding party is not willing to concede the issue and, as a result, the requesting party must prove the fact at trial.[7] [Citations]. The sanction for improperly responding to [RFA's] is the shifting of the award of incurred expenses[—see rule 36(a) of the Massachusetts Rules of Civil Procedure]. [¶] Further, [Massachusetts Rules of Civil Procedure, rule 36(b)], which governs [RFA's], does not specifically provide for the admission of denials in evidence. Although the rule states that admissions are conclusively binding on the responding party, it makes no parallel provision for the use of a denial. By contrast, [Massachusetts Rules of Civil Procedure, rule 33(b)], governing interrogatories, states that the answers to interrogatories 'may be used [at trial] to the

---

[6] Compare Code Civil Procedure, sections 2030.410 (use of interrogatories), 2033.410 (effect of admissions), 2033.420 (sanctions) with Massachusetts Rules of Civil Procedure, rules 33(b), 36(b), 37(c).

[7] The California Supreme Court has expressed a similar view of the purpose of RFA's: "Most of the other discovery procedures are aimed primarily at assisting counsel to prepare for trial. [RFA's], on the other hand, are primarily aimed at setting at rest a triable issue so that it will not have to be tried." (*Cembrook v. Superior Court* (1961) 56 Cal.2d 423, 429; see also *St. Mary v. Superior Court* (2014) 223 Cal.App.4th 762, 775.)

11

extent permitted by the rules of evidence.'  The omission of a similar provision in rule 36(b) indicates that, although admissions have binding effect, denials do not have such an effect and cannot be introduced in evidence." (*Gutierrez v. Mass. Bay Transp. Authority* (Mass. 2002) 772 N.E.2d 552, 567, final brackets in original.)  Therefore, the trial court "incorrectly concluded that a denial of a request for admission is admissible as a prior inconsistent statement" to impeach a witness at trial.  (*Ibid.*)

Intermediate courts in at least three states have similarly held that denials of RFA's are inadmissible at trial.  (See *Winn Dixie Stores, Inc. v. Gerringer* (Fla.Dist.Ct.App. 1990) 563 So.2d 814, 817 [citing *Morris, supra,* 135 Cal.App.3d 23 for the proposition that "denials cannot be used for impeachment purposes"]; *Mahan v. Missouri Pacific R. Co.* (Mo.Ct.App. 1988) 760 S.W.2d 510, 515 ["the propriety of defendant's denials is for the court to decide, not the jury"]; *Amer. Communications v. Commerce North Bank* (Tex.Ct.App. 1985) 691 S.W.2d 44, 48 ["[w]hen an answering party denies or refuses to make an admission of fact, such refusal is nothing more than a refusal to admit a fact"].)  In most cases the use of denials of RFA's to impeach a witness at trial "is nothing more than an attack on the 'character' of the defendant and that issue [i]s not before the jury."[8]  (*Mahan v. Missouri Pacific R. Co.*, at p. 515.)

Perhaps recognizing the lack of any inconsistency between Li's responses to the RFA's and his trial testimony, Gonsalves suggests that the responses were admissible to impeach Li's credibility by showing "[h]is attitude toward the action in which he

---

[8] At least one court has held that such refusal may be relevant evidence of bad faith at trial in bad faith insurance cases. (*Home Ins. Co. v. Owens* (1990) 573 So.2d 343, 344; see *White v. Western Title Ins. Co.* (1985) 40 Cal.3d 870, 885–886 (*White*) [insurer's litigation conduct admissible in bad faith insurance case], superseded by statute on other grounds as stated in *Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 297.)  However, the court expressly distinguished non-bad faith cases, where the party's litigation conduct is not directly relevant to an issue before the jury. (*Home Ins. Co. v. Owens*, at p. 344 [distinguishing *Winn-Dixie Stores, Inc. v. Gerringer, supra,* 563 So.2d 814].)  This distinction is consonant with California law. (See *Palmer v. Ted Stevens Honda, Inc.* (1987) 193 Cal.App.3d 530, 538–539 [*White* inapplicable where no special insurer-insured relationship or ongoing contractual relationship].)

testifies." (Evid. Code, § 780, subd. (j).) Gonsalves cites no cases that support his interpretation of this section of the Evidence Code. Section 780 has been held applicable to a witness's reluctance to testify or fear of retaliation for testifying (*People v. Merriman* (2014) 60 Cal.4th 1, 84; *People v. Mendoza* (2011) 52 Cal.4th 1056, 1084) or a witness's desire for revenge against the defendant (*People v. Stewart* (1983) 145 Cal.App.3d 967, 976–977). As Li points out, courts have held in other contexts that litigation conduct is not relevant evidence at trial in the ordinary case. (*Palmer v. Ted Stevens Honda, Inc., supra,* 193 Cal.App.3d at p. 539 ["[o]ne significant defect in such evidence is that it holds the client responsible for the attorney's litigation strategy"].) *White, supra,* 40 Cal.3d 870, which allows such evidence in a bad faith case, has been criticized as unfairly compromising a defendant's right to defend himself. (See *California Physicians' Service v. Superior Court* (1992) 9 Cal.App.4th 1321, 1327–1329 & fn. 5.) We find no support for Gonsalves's attempt to make a party's litigation conduct a legitimate subject for inquiry under Evidence Code section 780, subdivision (j), absent truly exceptional circumstances.

We are persuaded, therefore, that denials of RFA's are not admissible evidence in an ordinary case, i.e., a case where a party's litigation conduct is not directly in issue. Thus, the trial court permitted examination of Li that was unfair and prejudicial to him, and erred in admitting those responses in evidence.

2. *Questioning About Substantial Factor and Causation*[**]

Li argues the trial court erred by allowing plaintiff's counsel to question him about an ultimate legal issue in the case: whether his driving was a substantial factor in causing the accident. We agree.

a. *Background*

During examinations of Li and Xiaoming in plaintiff's case in chief, plaintiff's counsel extensively questioned the witnesses about whether Li's conduct was a substantial factor in causing the accident. Defense counsel raised at least 16 objections

---

[**] See footnote *, *ante*, page 1.

13

that the questions about causation and substantial factors were argumentative, improperly asked the witnesses to explain their legal contentions, and called for improper opinion testimony. All of the objections were overruled.

> b. *Analysis*

"If a witness is not testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is permitted by law, including but not limited to an opinion that is: [¶] (a) Rationally based on the perception of the witness; and [¶] (b) Helpful to a clear understanding of his testimony." (Evid. Code, § 800.)

" ' "[A] lay witness may testify in the form of an opinion only when he cannot adequately describe his observations without using opinion wording." ' [Citation.]" (*People v. Callahan* (1999) 74 Cal.App.4th 356, 380.) "Thus, a lay witness may express an opinion that a person was 'drunk' [citation], or that people engaged in a discussion were 'angry' [citation], or that an impact was strong enough to jar a passenger from a seat [citation], or that someone appeared to be 'trying to break up a fight.' [Citation.]" (*Osborn v. Mission Ready Mix* (1990) 224 Cal.App.3d 104, 113.) For example, the *Osborn* court held a plaintiff was properly asked if a hazard was "open and obvious"—"a matter which could best be described to the jury by way of opinion testimony." (*Id.* at pp. 112–113.) But the plaintiff was not properly asked if the defendant's conduct was "reasonable"—"the ultimate issue of fact to be decided by the jury." (*Ibid.*)

While appropriate to ask Li for a description of the accident, and how the car spun out as he drove along the curve of the on-ramp, counsel's repeated questions about whether Li's driving was a "substantial factor" in causing the accident were improper attempts to force Li to opine as to the ultimate issue of liability in the action.

Moreover, there was an inherent tension between the trial court's admission of expert witness testimony on the issue of causation and the court's allowing Li, a lay witness, to be questioned on the subject. The subject matter of expert and lay opinion testimony do not overlap: "[A] properly qualified expert, with 'special knowledge, skill, experience, training [or] education' may provide an opinion . . . [about] 'a subject that is sufficiently beyond common experience that [it] would assist the trier of fact.' ([(Evid.

14

Code, § 801].) . . . [¶] . . . ' "Lay opinion testimony is admissible where no particular scientific knowledge is required, or as 'a matter of practical necessity when the matters . . . observed are too complex or too subtle to enable [the witness] accurately to convey them to court or jury in any other manner.' [Citations.]" [Citation.]' [Citation.]" (*People v. Chapple* (2006) 138 Cal.App.4th 540, 546–547.) We have previously held that where a court rules that a witness lacks the expertise necessary to provide expert testimony on a subject, the court cannot allow the same witness to provide lay opinion testimony on the same subject. (*Id.* at p. 548.) Here, the trial court admitted expert testimony on causation of the accident, thus implicitly ruling that causation of this particular accident was a subject *beyond* common experience. (Evid. Code, § 801.) Having so ruled, the court did not explain why it nevertheless would permit plaintiff's counsel to solicit Li's lay opinion on the same subject matter.

We conclude the court erred in allowing plaintiff's counsel to examine Li and Xiaoming on "substantial factor" causation.

3. *Speeding Tickets*

Li argues the trial court erred in admitting evidence of his prior speeding tickets, which he claims was inadmissible propensity evidence. Again, we agree.

a. *Background*

During examination of Li in plaintiff's case in chief, plaintiff's counsel introduced evidence that Li had received two tickets before the 2008 accident for driving 80 to 85 miles per hour in a 65-mile-per-hour zone. He also elicited Li's acknowledgment that he drove the M3 80 to 85 miles per hour in a 65-mile-per-hour zone during the test drive.

Defense counsel twice objected to examination about the speeding tickets on grounds that the questions solicited irrelevant and propensity evidence. The court overruled the objections. The court later explained on the record, "I allowed it in for a specific purpose and that was to show knowledge, knowledge as to how fast he was going because . . . there were different estimates of speed. . . . [¶] . . . [¶] . . . He's unclear during his testimony about how fast he was going at various times during this test drive.

15

This goes to his knowledge about what it feels like to speed." Defense counsel responded, "I don't think he was unclear. He said he was speeding."

Defense counsel filed a midtrial motion to strike and exclude the evidence of Li's driving history, arguing the evidence was inadmissible character and specific acts evidence under Evidence Code sections 1101, subdivision (a) and 787. Moreover, "[s]uch evidence does not prove any element of this case" because "both experts have already testified that this accident occurred at [a] speed of 25mph on a 65mph on-ramp so speed is not even an issue in this case." The court denied the motion.

Defense counsel then asked for a limiting instruction regarding the evidence, which apparently would have instructed the jury it could not consider the evidence for any purpose. The court rejected the proposed instruction because it had admitted the evidence for a specific purpose. Defense counsel reiterated that he did not understand the rationale for admitting the evidence to show Li's knowledge that he was speeding and said, "Then I don't want the limiting instruction, . . . I don't understand it myself." Li made similar arguments in his denied motion for a new trial.

    b. *Analysis*

With specific exceptions not relevant here, Evidence Code section 1101 provides that "evidence of a person's character or a trait of his or her character (. . . in the form of . . . specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion," except to "prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, . . . ) other than his or her disposition to commit such an act," or to impeach a witness's credibility. (See also *id.*, §§ 787–788 [prior conduct admissible on credibility alone only if conduct resulted in felony conviction].). However, even if admissible under Evidence Code section 1101, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (*Id.*, § 352.)

In personal injury actions arising from traffic accidents specifically, "as a general rule[,] evidence of prior traffic citations is not admissible to prove that on the particular occasion in question the driver receiving such prior citations was negligent." (*Travis v. Southern Pacific Co.* (1962) 210 Cal.App.2d 410, 420.) However, where a car's speed at the time of impact was an issue at trial and the driver testified that he was " 'always conscious of speed laws,' " the driver was properly impeached with prior speeding tickets. (*Id.* at pp. 419–420, 422.) Here, Li did not testify that he always abided by the speed limit; on the contrary, he admitted that he sped during the test drive. Therefore, the prior ticket evidence did not serve to impeach Li's testimony.

The trial court admitted the evidence under Evidence Code section 1101, subdivision (b) to show Li had "knowledge of how fast he was going on this occasion." The court apparently reasoned that Li's prior speeding tickets demonstrated that Li *knew* what it felt like to drive at 80 to 85 miles per hour: because Li had been penalized for driving at those speeds, he must have learned from that experience what it felt like to drive at those speeds.[9] The court stated the evidence was admissible because Li was "unclear during his testimony about how fast he was going at various times during this test drive." Before he was asked about the speeding tickets, however, Li had only been asked how fast he was driving while on the curve of the on-ramp (via questions about his responses to RFA's and about substantial factor causation). Plaintiff's own expert had testified that Li entered the curve of the on-ramp traveling at about 25 miles per hour. Therefore, the speeding tickets were not properly admitted to impeach prior testimony by Li. Subsequently, Li admitted that he drove 80 to 85 miles per hour in a 65-miles-per-hour zone during the test drive. Gonsalves, on the other hand, testified that Li drove as fast as 120 miles per hour on the highways during the test drive. If the prior speeding tickets tended to show that Li knew what it felt like to speed, the evidence would tend to corroborate Li's testimony rather than impeach it.

_____

[9] Gonsalves agrees this was the court's rationale.

17

On appeal, Gonsalves argues the evidence was admissible to "impeach" Xiaoming. Gonsalves cites his own testimony that Xiaoming persuaded him to allow Li to test drive the M3 by saying that Li was a safe driver who had never received any driving citations. But Xiaoming had been dismissed as a defendant prior to Gonsalves's testimony. Moreover, the questions about the speeding tickets were posed not to Xiaoming but to Li and were asked, not in the context of questioning a witness about how Gonsalves was induced to allow Li to test drive the car, but in the context of questioning Li about how fast he was driving on the on-ramp at the time the accident occurred. In sum, the speeding tickets were not relevant to establish Xiaoming's liability or to otherwise "impeach" Xiaoming. Because the evidence had little, if any, relevance to the purpose for which it was ostensibly admitted, and was completely inadmissible as propensity evidence to establish liability, it was unduly prejudicial and should have been excluded under Evidence Code section 352.

4. *Hearsay*

Li argues the trial court erred in admitting hearsay evidence about what Gonsalves allegedly told California Highway Patrol Officer Mitchell Buck when interviewed at the dealership following the accident. We do not find error in the admission of this evidence.

a. *Background*

In plaintiff's case in chief, Buck testified that he responded to the crash with his partner, Officer Erik Gutierrez, and personally interviewed Gonsalves and Li at the dealership. Gonsalves told Buck, "Basically that they were on a test drive. They were on Concord Avenue preparing to get onto southbound 242. And as the driver of the vehicle made the turn, he accelerated, spun the vehicle out, and hit the guardrail." Buck did not recall hearing about an argument between the parties or any dispute about whose idea it was to press the M button.

Plaintiff's counsel proffered Gutierrez's deposition testimony to impeach Buck. After the court found that Gutierrez was unavailable within the meaning of Code of Civil Procedure section 2025.620, subdivision (c)(2)(E), it entertained argument on whether the content of the deposition was otherwise admissible. Defense counsel argued, "[T]he

18

sections they want to read are all hearsay on hearsay.  Officer Gutierrez says multiple times in his deposition that 'I didn't talk to anybody.  I let Officer Buck handle everything.' [¶] So then he had conversations with Officer Buck, and he gave some information in his deposition of what he thinks Officer Buck said about the accident."  Moreover, "you can't offer an inconsistent statement against a witness if they're not a party unless you confront them with it on the stand so they can have a chance to deal with it."  The court responded, "Yes, you can if they're subject to recall."  Defense counsel said, "Well, he's been released," and the court said it would "go back and look."  The court then said, "But it's not just inconsistency.  Impeachment rules are a little bit different.  It impeaches Officer Buck."  Defense counsel disagreed the rules were different.  The court admitted the deposition testimony, and Plaintiff's counsel read to the jury the following excerpts:

"Question: . . . 'If you read through this briefly, do you have any memory of this accident?'

"Answer:  'Yes, I do.' [¶] . . . [¶]

"Question:  ' . . . Mr. Gonsalves[] has described the entire way that the entire test drive had some complaints about the way my client was driving during the entire test drive.'

"Answer:  'Okay.'

"Question:  'I'm wondering did you hear anything about that?'

"Answer:  'Okay.  No, I didn't.  I believe if we had, I would have put that on a statement here or somewhere in the report.' [¶] . . . [¶]

"Question:  'The M button is mentioned in . . . [Li's] statement, but it's not mentioned in [Gonsalves's] statement.  What I'm wondering, do you have any memory of Officer Buck when talking with him that there was a dispute between the parties about whether or not the M button was used.'

"Answer:  'The only thing I recall is that . . . Gonsalves, told [Li]'

"Question:  'Yes?'

"Answer: 'To not press the button. I guess he went ahead and pressed it. That's from what I recall.'

"Question: 'And that is your memory?'

"[Answer:] 'With the conversation I had with Officer Buck.' "

The trial court instructed the jury: "You have heard some testimony read from the deposition transcript of Officer Gutierrez. ·In that testimony, Officer Gutierrez recalled a conversation he had with Officer Buck. That testimony cannot be considered for the truth of the matter alleged in the conversation. It can be used to show that Officer Gutierrez has a different memory of events from Officer Buck."

### b. *Analysis*

" 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated. [¶] . . . Except as provided by law, hearsay evidence is inadmissible." (Evid. Code, § 1200, subds. (a), (b).) Each level of hearsay in proffered evidence must come within an exception to the hearsay rule for the evidence to be admissible. (*Id.*, § 1201.)

The foundational issue that made admission of Gutierrez's deposition testimony potentially relevant was whether Gonsalves told Li in the car not to press the M button. This issue was relevant to whether Li or Gonsalves acted negligently and whether any such negligence was a substantial factor in causing the accident. Li, Xiaoming and Gonsalves gave conflicting testimony on the issue. Gonsalves testified that Li, not Gonsalves, was the first person to mention the M button and that he specifically told Li not to push the button.

The defense impeached Gonsalves with evidence (including Buck's testimony) that Gonsalves did not mention reckless driving by Li or a dispute over the M button in his statement to police immediately after the accident. Although Buck related out-of-court statements by Gonsalves, those statements were admissible because they were offered against a party opponent. (Evid. Code, § 1220.)

Plaintiff's counsel then attempted to rehabilitate Gonsalves with the deposition testimony of Gutierrez, which contradicted Buck's testimony about Gonsalves's

20

statements to Buck.  The court ruled that the deposition testimony was admissible pursuant to Code of Civil Procedure section 2025.620, subdivision (c)(2)(E) despite the fact that it recited out-of-court statements by Gutierrez.  Li argues that the question before us is whether the next layer of hearsay in the deposition testimony—Buck's statement to Gutierrez—falls within some exception to the hearsay rule.  He argues it does not because a prior inconsistent statement of a witness is admissible only if it "is offered in compliance with Section 770."  (Evid. Code, § 1235.)  Evidence Code section 770 provides, "Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless: [¶] (a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or [¶] (b) The witness has not been excused from giving further testimony in the action."  Buck was not given an opportunity during his testimony to explain or deny his alleged statement to Gutierrez.  (See Simons, Cal. Evidence Manual (2015) Hearsay Evidence, § 2:42, pp. 123–124.)  Nor was Buck subject to recall; he had been excused at the conclusion of his testimony at trial.

The flaw in Li's argument is his assumption that Gutierrez's testimony about Buck's statement was offered to prove the truth of what Buck said:  i.e., that Gonsalves in fact told Buck that he had told Li not to press the M button.  (See Simons, Cal. Evidence Manual, *supra*, § 2:42, p. 123 ["[c]ompliance with [Evid. Code] § 1235 ensures that a prior inconsistent statement is admissible not only to impeach the witness but also for the truth of the facts asserted in the statement"].)  Gutierrez's testimony, however, was expressly admitted on the condition that the "testimony *cannot* be considered for the truth of the matter alleged in the conversation.  It can be used to show that Officer Gutierrez has a different memory of events from Officer Buck" (italics added), i.e., to impeach Buck's testimony.

The court did not err by admitting the testimony.

5.      *Medical Expert Testimony*

Li argues the trial court erred in admitting the testimony of Gonsalves's medical expert, Santi Rao, M.D.

a.      *Background*

In a motion in limine, defense counsel attempted to exclude testimony by Rao based on alleged violations of expert witness disclosure rules, specifically Rao's designation as treating physician and nonretained expert witness until shortly before trial, when he was redesignated a retained expert. During argument on the motion, the court commented that the scope of a treating physician's testimony is "basically . . . the same" as the scope of a retained medical expert's testimony and asked whether any improper designation of Rao mattered. Defense counsel argued "the difference is giving them documents . . . . If you give a doctor documents, . . . you've got to list them as a retained expert," but the court suggested a treating physician might review a patient's entire medical records in order to prepare for surgery, not for the purpose of providing an expert opinion on causation. The court ruled that Rao would be allowed to opine on causation if he testified that he reviewed Gonsalves's medical history as part of his planning for treatment and if Rao established that he had the expertise to render a causation opinion based on his review of that record and his examination and performance of surgery on Gonsalves.

On direct examination, Rao testified that he reviewed Gonsalves's full prior medical records before coming to a diagnosis or treatment plan for Gonsalves, and he was permitted to offer an opinion on causation. Specifically, Rao testified that Gonsalves had two disk herniations that were caused by the trauma of the car accident rather than regular wear and tear. The herniations caused the numbness and tingling in Gonsalves's arm, and Gonsalves's neck and back pain also resulted from the accident. "Absent that crash, there's no way that he would have had these symptoms." He testified that Gonsalves's surgery was medically necessary and Gonsalves likely would need further surgery in the future.

22

### b. *Analysis*

On appeal, Li renews his argument that Rao should have been excluded as a witness because Gonsalves did not properly designate him as a retained expert witness. The court, however, admitted the testimony on the ground that Rao properly testified about causation in his role as a non-retained treating physician. Li does not establish that the scope of Rao's testimony was beyond that appropriate for a treating physician. Therefore, Li fails to meet his burden of establishing error.

## B. *Juror Misconduct*

Li argues the trial court erred in failing to make a sufficient inquiry into the juror misconduct during trial. We conclude that the trial court did not prejudicially err.

### 1. *Background*

On the fifth day of trial, Juror No. 9 reported that Juror No. 17 told her she had "looked . . . up" plaintiff's trial counsel and learned that he was a "hot shot," which made her feel honored to serve as a juror in this case. Juror No. 17 had also told Juror No. 9 during voir dire that the case was five years old, a fact that Juror No. 9 thought had not been publicly disclosed.

The court interviewed Juror No. 17 and confirmed that she had looked up plaintiff's counsel and formed a favorable opinion of him. The court then said, "And then you shared [what you learned about the attorney] with another juror, at least one other juror. Correct?" Juror No. 17 replied, "Yes, I did." The court admonished her not to do any other research about the case and not to discuss the matter with other jurors. After the juror left the courtroom, the court told counsel it was inclined to dismiss Juror No. 17 from the jury. Defense counsel said, "Actually, I think we need to know more. It's more than likely she's actually made these comments to other jurors too, I guess, not just one." The court responded, "Well, I asked that specifically and she said no," and defense counsel said, "You asked if she said the comments to that one—if she said it to any other jurors at lunch or anything like that? I didn't hear that question." The court then said, "I'm going to excuse her. I will re-admonish the jury as they come in. I have no indication that comments were made to anyone else or around anyone else, and I

23

believe I did ask her whether she shared that with anyone else, but I'll clarify that with the other jurors." After the court confirmed with Juror No. 9 that Juror No. 17's comment would not affect her ability to be impartial, the court replaced Juror No. 17 with an alternate juror and addressed the full jury: "I want to reiterate you cannot have any contact with anyone about this case or about any of the parties involved, which includes the lawyers. You can't research them. You can't ask about them. You can't discuss them. The case is about the evidence, not the lawyers. [¶] I want to impress upon you how important that its, that there be absolutely no research, no Googling, no discussion, no anything about anything having to do with the case, which includes the lawyers. All right? Thank you."

Li argued in his motion for a new trial that the court conducted an insufficient inquiry into whether the conduct tainted the jury. In its denial of the motion, the court explained, "[W]e had a fairly lengthy discussion with both of those jurors on the record. . . . [¶] . . . [¶] It was . . . clear to me at the time that that was the only juror that the offending juror . . . had spoken to. And I declined that we [were] going to go one by one through the other jurors because I didn't think, No. 1, it was necessary. There wasn't anything to suggest whatsoever that she had had any conversations with anyone else. [¶] And No. 2, I thought, frankly, it would highlight the issue and open up a door that wasn't previously opened. There was nothing in front of me then or now to suggest that any of the other jurors had been contacted by the one juror or had done anything inappropriate. [¶] . . . [N]ormally when I see this, there's a request for juror identifying information so that interviews can be done and affidavits produced if, in fact, there was anything there. I didn't have any of that attached to the motion."

2.    *Analysis*

Although Li argues the trial court erred by conducting an insufficient inquiry into the misconduct, he cites no legal authority for the proposition that the court's duty of inquiry in such situations extends as far as he suggests. " 'The decision whether to investigate the possibility of juror bias, incompetence, or misconduct—like the ultimate decision to retain or discharge a juror—rests within the sound discretion of the trial court.

24

[Citation.] . . . [¶] [A] hearing is required only where the court possesses information which, if proven to be true, would constitute "good cause" to doubt a juror's ability to perform his duties and would justify his removal from the case.' (*People v. Ray* (1996) 13 Cal.4th 313, 343.) [¶] . . . [A] trial court's failure to question each juror privately regarding a juror misconduct claim presents an issue of abuse of discretion, not one of constitutional magnitude . . . . (*People v. Pinholster* (1992) 1 Cal.4th 865, 927–928.)" (*People v. Castorena* (1996) 47 Cal.App.4th 1051, 1065, parallel citations omitted.)

The trial court had substantial evidence that Juror No. 17 gathered information about plaintiff's counsel and shared that information with Juror No. 9. The court followed up on that information by interviewing both jurors, dismissing Juror No. 17, confirming that Juror No. 9 could remain impartial, and reminding the other jurors that they could not independently investigate the case. Citing the fact that Juror No. 17 spoke to Juror No. 9 twice about the case, suggesting she was talkative and might not have confined her comments to Juror No. 9, Li faults the court for not inquiring whether Juror No. 17 spoke with other jurors about plaintiff's attorney. The court stated that it had "asked that specifically and she said no." In fact, the court had not. But, as the court stated when denying Li's motion for a new trial, it never had *affirmative* evidence that Juror No. 17 had in fact shared the prejudicial information with anyone else on the jury. "There was nothing in front of me then or now to suggest that any of the other jurors had been contacted by the one juror or had done anything inappropriate." In the absence of such evidence, the court had no duty to inquire further. The scope of the court's inquiry was committed to its discretion and the court explained that it believed further inquiry would highlight the issue, potentially creating prejudice. There was no error.

C. *Attorney Misconduct*

Li argues that Gonsalves's trial counsel committed multiple acts of misconduct: making repeated and unnecessary references to Li's and Xiaoming's Chinese origin; asking the jury to "send a message" through its verdict; improperly appealing to the jury's sympathy by mentioning his prior representation of a paraplegic child; and telling the jury that Gonsalves would be required to reimburse the workers' compensation

25

system if he recovered damages at trial, a fact not in evidence. "In evaluating claims of [attorney] misconduct, '[e]ach case must ultimately rest upon [the reviewing] court's view of the overall record, taking into account such factors, inter alia, as the nature and seriousness of the remarks and misconduct, the general atmosphere, including the judge's control, of the trial, the likelihood of prejudicing the jury, and the efficacy of objection or admonition under all the circumstances.' [Citation.]" (*Du Jardin v. City of Oxnard* (1995) 38 Cal.App.4th 174, 178.) We conclude that Gonsalves's trial counsel committed misconduct in at least two instances.

1. *Chinese Origin*

a. *Background*

In opening statement and examinations of Li and Xiaoming, plaintiff's counsel made several comments or elicited evidence that both were born in China and that Xiaoming lived and worked in China, returning to California only for visits. Defense counsel did not object to these comments at trial. However, in his motion for a new trial, Li cited the comments as evidence of prejudicial attorney misconduct. "This testimony concerning being from China . . . are the first statements the jury ever heard from the defendants. None of these questions elicited any facts about the actual accident on December 28, 2008. None of these questions elicited any facts about the injury claims of plaintiff. All of these questions likely inflamed the jury." Plaintiff argued the evidence was admissible "as it demonstrates that [Xiaoming] is firmly entrenched in China, and therefore was not realistically interested in purchasing a vehicle in the United States . . . [and had] no real incentive to purchase a BMW here . . . ."

b. *Analysis*

"[Q]uestioning or argument of counsel relative to the race, nationality or religion of a party, when irrelevant to the issues, is improper." (*Kolaric v. Kaufman* (1968) 261 Cal.App.2d 20, 27–28.) Gonsalves argues the evidence that Xiaoming worked and primarily lived in China was relevant to prove that, contrary to Xiaoming's testimony, they took the M3 on a test drive for fun rather than because of a sincere interest in buying the car.

26

Li raises legitimate concerns about the jury impact of this line of questioning. However, the defense raised no contemporaneous objections and never requested an admonishment that might have dispelled any lingering prejudice and deterred plaintiff's counsel from pursuing the line of questioning. Moreover, the court instructed the jury, "You must not be biased in favor of or against any witness because of his or her disability, gender, race, religion, ethnicity, sexual orientation, age, national origin, or socioeconomic status," and we presume the jurors abided by this instruction. In all of the circumstances, we cannot conclude that the trial court abused its discretion by not intervening sua sponte or in denying the motion for new trial on this ground.

2. *"Send a Message"*

a. *Background*

Plaintiff's counsel argued in closing, "When we talk about negligence in a case like this, ladies and gentlemen, and when we get our community together, what we do is we have a conversation really about what we believe reasonable conduct in our community is. That's what your verdict will do in this case. Your verdict will not only send a message to the Lis, but also to the whole community.

"[Defense counsel:] Objection. Improper argument.

"THE COURT: Ladies and gentlemen, as I – well, rephrase your argument.

"[Plaintiff's counsel:] Certainly. What you're asked to decide as a jury is what is reasonable conduct, and the decision that you make sets a standard here in the community for what we accept and what we don't accept. And in this case, it happens to be what we accept with the way people drive cars and whether or not people take unreasonable risks for themselves and whether they take unreasonable risks for others, which is exactly what Ran Li did in this case."

In addition to objecting when the argument was first made, Li argued in his motion for a new trial: "Plaintiff's counsel often urge a jury to 'send a message to the community' by its verdict. This argument may be appropriate in punitive damages cases [citation]. But many judges feel it is *improper* in other cases, particularly when made in the context of the *amount of damages* to be awarded. [Citation.]"

27

b. *Analysis*

"Counsel is granted wide latitude to discuss the merits of the case, both as to the law and facts, and is entitled to argue his or her case vigorously and to argue all reasonable inferences from the evidence. [Citation.] Any suggestion that the jury should 'send a message' by inflating its award of damages, however, would be improper where, as here, punitive damages may not be awarded." (*Nishihama v. City and County of San Francisco* (2001) 93 Cal.App.4th 298, 305.)

Here, plaintiff's counsel urged the jury to "send a message" by holding Li *liable* for negligence, not by urging the jury to return a large damages verdict. Further, when counsel later argued in favor of large damages, he did not allude back to the argument. Therefore, there was no error. In any event, the court responded to defense counsel's objection by directing plaintiff's counsel to rephrase his argument. Plaintiff's counsel urged the jury to set "a standard here in the community for what we accept and what we don't accept" by returning a liability verdict, an argument Li does not challenge as improper. Because the comment was fleeting and addressed liability rather than damages, and because the court interposed a redirection to counsel, we conclude that any error was harmless. (See *Nishihama v. City and County of San Francisco, supra,* 93 Cal.App.4th at pp. 305–306; *Garcia v. ConMed Corp.* (2012) 204 Cal.App.4th 144, 161.)

3. *Paralyzed Child*

a. *Background*

On cross-examination of defense expert radiologist Dr. Erik Gaensler, plaintiff's counsel asked:

"Q. . . . [Y]ou do this same kind of testimony three, four times a year for juries just like this, correct?

"A. Some years not at all; other years more. . . .

"Q. Just in the last couple of years, you've testified in at least three other courtrooms here in the Bay Area on behalf of the defendant where you've given basically

28

the same Power Point that you don't see any evidence of traumatic injury on these MRI scans; is that right? [¶] . . . [¶]

"[A.] Well, the same Power Point would mean it's the same Power Point. Obviously, every patient is different. Every situation is different. [¶] It would be like saying to a surgeon you do the same operation on everybody. So each patient has different films. There's different features to the films. [¶] . . . [¶]

"[Q.] Doctor, you testified against my client Katarina Sankovich, my client, in Los Angeles in the Sankovich case about two years ago. Do you remember that?

"A. Very well. That was a young child. [¶] . . . [¶] . . . Whether she was three, four, or five, I don't remember. But she was in a car accident and had a spinal cord injury in her lower lumbar spine. [¶] So it had absolutely nothing to do with the cervical spine, absolutely nothing to do with degenerative disease. [¶] There wasn't a question of doubt as to the instant when it occurred, which is when the car accident occurred and the subsequent hospitalization. [¶] I mean to you, a spine case may be a dime a dozen. To me, they could not have been more different . . . . [¶] . . . [¶]

"[Q.] They're not a dime a dozen to me. I represented a seven-year-old paraplegic in that case, Doctor. [¶] In this case, I represent a gentleman who was very badly injured and needed spinal surgery and needs another spine surgery.

"THE COURT: Can I see counsel at the bench, please?

"(Bench conference)

"THE COURT: The jury will disregard the question. Rephrase, please."

While discussing Gaensler's testimony in his rebuttal closing argument, plaintiff's counsel said, "He regularly testifies that the MRI doesn't show an injury as opposed to degenerative findings. He admitted to testifying against another one of my clients, a seven-year-old paraplegic girl two years ago." Defense counsel objected that "[t]hat part was stricken" and the court sustained the objection.

In Li's motion for a new trial, defense counsel wrote that plaintiff's counsel had told the jury "that he once represented a child with paralys[i]s and [Gaensler] . . . [had] tried to minimize that injury as well. . . . The defense has no way to fight such claims . . .

29

without arguing the facts of a completely different case. The jury was improperly told that plaintiff['s] attorney represents sympathetic and badly injured children and Dr. Gaensler is essentially [an] evil defense witness who will say anything. . . . These were blatant and inexcusable attempts to inflame the jury." The defense argued the comment was intentional misconduct in light of the extensive trial experience of plaintiff's counsel, and a ground for a mistrial.

### b. *Analysis*

"[R]emarks intended to play upon the emotions of sympathy, shock and horror [are] . . . improper matters for the jury to consider. [Citation.]" (See *Horn v. Atchinson, T. & S. F. Ry. Co.* (1964) 61 Cal.2d 602, 609.) Gonsalves argues that his counsel's remark during the cross-examination of Gaensler was provoked by and was a fair response to the witness's own suggestion that plaintiff's counsel viewed personal injury cases as a dime a dozen. We assume for purposes of argument that he is correct as to the initial comment. Gonsalves, however, provides no explanation for his counsel's repeating the statement during closing argument after the trial court had sustained a defense objection to the initial statement and told the jury to disregard it. The remark in argument was therefore misconduct. Although the court again sustained a defense objection to the argument and again admonished the jury to disregard the statement, we assess the prejudicial effect differently when the conduct appears deliberate. "[M]isconduct by counsel in closing argument in civil cases can constitute prejudicial error entitling the aggrieved party to reversal of the judgment and a new trial." (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 802.) We consider the prejudicial effect of this instance of misconduct *post* in evaluating cumulative prejudice.

### 4. *Workers' Compensation*

### a. *Background*

The admissibility of workers' compensation and private insurance evidence was the subject of extensive pretrial argument. The defense wanted to challenge Rao's medical bills by questioning him about reimbursement rates by private or workers' compensation insurers, and to show Gonsalves's failure to mitigate by introducing

30

evidence of the rates his private and workers' compensation insurers would have charged for the same surgery. Gonsalves argued evidence of insurance was irrelevant, and the court adamantly refused to allow any mention of Gonsalves's private and workers' compensation insurance coverage. "Whether or not there is insurance coverage or a workers' comp claim is by case law totally irrelevant and inadmissible in front of this jury. . . . [¶] We repeatedly in all these cases instruct the jury that whether there's insurance or not is none of their business, basically."

On the first day of testimony, a plaintiff's witness disclosed that Gonsalves was receiving treatment through the workers' compensation system. No objection was made and no admonishment by the court was requested. Outside the presence of the jury, defense counsel renewed his argument that he should be able to reference Gonsalves's insurance coverage, but the court stood by its original ruling. Frequent references to Gonsalves's workers' compensation coverage were made throughout the trial. After the close of evidence, the trial court instructed the jury: "You must not consider whether any of the parties in this case has insurance. The presence or absence of insurance is totally irrelevant. You must decide this case based only on the law and the evidence. You are not to consider the presence of workers' compensation insurance when considering negligence or damages."

In closing argument, plaintiff's counsel said: "It is no secret that Ken Gonsalves was injured while he was working. It is no secret that there was a workers' compensation claim and that workers' compensation was directing much of his medical treatment and paying for it. With that said, you are not allowed to consider that. . . . You're not allowed to walk back in the jury room, ladies and gentlemen, and say, 'Gee whiz, he had a work comp claim, work comp should have taken care of it, he should be fine.' . . . You can't know what they have to be paid back. There are very specific laws about this. . . . There are very specific rules about paying work comp back and claims the [*sic*] had." Defense counsel objected, saying, "That's putting evidence in that's not accurate," and the court ordered the last comment stricken.

b.      *Analysis*

"In conducting closing argument, attorneys for both sides have wide latitude to discuss the case. . . . [¶] [However, a]n attorney who exceeds this wide latitude commits misconduct.  For example, '[w]hile a counsel in summing up may indulge in all fair arguments in favor of his client's case, he may not assume facts not in evidence or invite the jury to speculate as to unsupported inferences.'  [Citation.]"  (*Cassim v. Allstate Ins. Co., supra,* 33 Cal.4th at pp. 795–796.)

When plaintiff's counsel told the jury, "There are very specific laws about this. . . . There are very specific rules about paying work comp back . . . ," he discussed matters not in evidence.  Moreover, he contravened repeated, specific rulings by the trial court that counsel could not mention Gonsalves's private or workers' compensation insurance during the trial.  Although witnesses throughout the trial testified without objection that Gonsalves received care from workers' compensation medical providers, the *gravamen* of the court's ruling was that the jury should not be invited to consider whether insurance funds were available to compensate Gonsalves.  Such evidence might prejudice Gonsalves by suggesting he would obtain a double recovery if he was awarded damages at trial, and it might prejudice Li by suggesting he would not be paying a damages award out of pocket because the judgment would be covered by insurance proceeds.  Plaintiff's counsel's comment about Gonsalves's obligation to reimburse the workers' compensation system contravened the purpose of the court's ruling because it suggested that Gonsalves *could not* receive a double recovery.  Therefore, the argument was misconduct.

Gonsalves argues on appeal that Li's claim is disingenuous because defense counsel himself sought admission of insurance coverage, repeatedly questioned witnesses about workers' compensation, and mentioned workers' compensation several times during closing argument.  However, defense counsel's motion to admit evidence of insurance coverage was denied, witnesses' testimony about workers' compensation coverage did not contravene the purpose of the court's ruling (i.e., directly suggest the availability of insurance funds to compensate Gonsalves), and defense counsel's

32

comments during closing argument did not introduce matters not in evidence or violate the spirit of the court's rulings.[10]

As stated previously, counsel's misconduct in closing argument can constitute prejudicial error warranting reversal of the judgment and a new trial. (*Cassim v. Allstate Ins. Co., supra,* 33 Cal.4th at p. 802.) We consider the prejudicial effect of this instance of misconduct *post*.

D.    *Cumulative Prejudice*

We have concluded that the trial court erred in admitting into evidence Li's denials of Gonsalves's RFA's and allowing plaintiff's counsel to question Li about those denials; allowing plaintiff's counsel to question Li about causation of the accident; and admitting evidence of Li's speeding tickets. We have also concluded that plaintiff's counsel committed misconduct by restating that he had represented a paralyzed child in prior litigation despite a prior ruling that the statement was inadmissible, and by referencing Gonsalves's supposed obligation to reimburse the workers' compensation system from his recovery at trial. We now consider whether these cumulative errors warrant a reversal of the verdict.

All of the errors are subject to the reversible error standard set forth in *People v. Watson* (1956) 46 Cal.2d 818. (*Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1317 [admission of evidence]; *Cassim v. Allstate Ins. Co., supra,* 33 Cal.4th at pp. 800–802 [attorney misconduct].) That is, we will reverse only if there is a reasonable probability that a result more favorable to Li would have been reached in the absence of the errors. (*People v. Watson*, at p. 836.)

On a cold record, the case appears to be a close one. The traffic reconstruction experts agreed that Li entered the curve of the on-ramp at approximately 25 miles per

---

[10] In closing argument, defense counsel identified witnesses or persons mentioned in exhibits as Gonsalves's workers' compensation medical providers or examiners; argued the surgery should not have taken place before certain test results ordered by a workers' compensation provider had been received; and argued repeatedly that Gonsalves had exaggerated the facts of the accident when he reported his history to workers' compensation medical providers.

hour and accelerated into the curve. Because the on-ramp led to a freeway, with a speed limit of 65 miles per hour, the mere fact that Li accelerated on the on-ramp was not in itself evidence of driver error. There was evidence that the M button could affect the car's stability control and that Li pushed it before entering the on-ramp, although whether he did so on his own initiative or at Gonsalves's urging was disputed. Experts disagreed about whether Li's speed and manner of driving necessarily caused the accident, or whether pressing the M button disengaged the car's dynamic stability control, causing or contributing to the accident.

The sharpest disagreement at trial was about the parties' conduct and statements during the two test drives. On the evidence presented, the jury reasonably could have found that Li was not negligent or, alternatively, that Gonsalves was contributorily negligent—dependent upon which version of the facts the jury accepted. As the trial court wrote posttrial, "It was clear to the Court based on the testimony presented at trial that credibility of the witnesses (in particular [Gonsalves] and [Li and Xiaoming]) was a major deciding factor in evaluating what occurred during the test drive" and caused the accident.

The errors in admission of evidence and in permitting prejudicial questioning of Li, as well as the misconduct of plaintiff's counsel (in at least one instance apparently intentional), all tended to prejudice the jury against the defense in this credibility-determined case. The instance of attorney misconduct regarding Gonsalves's obligation to reimburse the workers' compensation system also potentially prejudiced Li regarding the size of the damages award. We therefore conclude that the errors were cumulatively prejudicial.

Because the case turned largely on the parties' credibility of the parties, and because of multiple evidentiary errors and instances of attorney misconduct, we conclude a more favorable result to Li was reasonably probable had the errors not occurred.

### III.    DISPOSITION

The judgment is vacated and the matter is remanded to the trial court for a new trial. Gonsalves shall bear Li's costs on appeal.

34

_____

BRUINIERS, J.


WE CONCUR:


_____

JONES, P. J.


_____

NEEDHAM, J.

"[Plaintiff's Counsel:] Mr. Li, what type of reasonable inquiry did you make to determine whether you were driving too fast at the time of the crash? [¶] . . . [¶]

"[Li:] I guess I would think back to what happened and whether or not I typically take that turn at that speed, a speed that, you know, what I remembered the speed was. And, you know, I didn't think that it was a speed that was too fast for that turn.

"[Plaintiff's Counsel:] . . . [¶] What information did you need in addition to thinking back to determine whether or not you had sufficient information to admit that you were driving too fast? [¶] . . . [¶]

"[Li:] I guess, you know, having to be there at the scene taking the turn in a vehicle again would all be things that I guess would be additional information that would have allowed me to better assess the situation.

"[Plaintiff's Counsel:] So you're telling this jury that unless you went back to the scene and drove a different vehicle back in that turn, you couldn't tell them whether you were driving too fast at the time of the crash? [¶] . . . [¶]

"[Li:] [T]he more information I have about the scene, about the vehicle, about the conditions that day, you know, . . . whenever you make a judgment like that, you want to have as much information as possible. [¶] . . . [¶]

"[Plaintiff's Counsel:] [W]hat other information did you need? You knew what the conditions were that day. You were the one driving at the time of the crash. You said you thought back to how fast you were going. [¶] . . . [¶] . . . What other information did you need, sir?

"[Li:] I guess – I mean it would have been nice to be at the scene, just look at the turn again and whether or not, you know, I typically would take a turn like that at that speed.

"[Plaintiff's Counsel:]  Well, you had 35 days after you received these Requests for Admissions to do whatever type of investigation you wanted before you had to prepare and serve your response, correct? [¶] . . . [¶] . . . Were you under any time pressure to admit or deny that you were driving too fast back at the time of the crash?

"[Li:]  I was working at the time, so I guess I was under a little bit of pressure. [¶] . . . [¶]

[Plaintiff's Counsel:]  Okay.  Did you ever request additional time to respond to these Requests for Admissions so you could conduct whatever type of investigation you felt was necessary?

"[Li:]  No."

After asking Li questions about whether his driving was a substantial factor in causing the crash, plaintiff's counsel again asked:

"[Plaintiff's Counsel:]  Mr. Li, would you admit to this jury that the amount of pressure you applied to the accelerator as you were making the right turn onto Highway 242 northbound on-ramp was a substantial factor in causing this accident? [¶] . . . [¶]

"[Li:]  I mean my foot was on the accelerator, on the pedal. . . . I pushed the accelerator to make the car go onto the on-ramp. . . . [O]bviously . . . when that happens, the car is accelerating and hitting the guardrail.

"[Plaintiff's Counsel:]  Mr. Li, when you answered this question under oath in February of last year, you said that you had a lack of information and knowledge to admit this Request for Admission. [¶] What do you mean by that, lack of information and knowledge? . . .

"[Li:]  [I]t's hard to remember whether or not I pushed it too hard or pushed it at all or whatever. [¶] . . . I mean the crash happened in a matter of seconds.  It's hard to think back about the amount of pressure that I put on a pedal right before a car crash.

"[Plaintiff's Counsel:]  In February of last year under penalty of perjury, you said a reasonable inquiry concerning the matter has been made and the information known or

37

readily obtainable is insufficient to enable responding party to admit the matter. [¶] What do you mean by that, sir? [¶] . . . [¶]

       "[Li:]  Basically, what I said before."

Superior Court of Contra Costa County, No. MSC10-03516, Laurel S. Brady, Judge.

Stratman, Patterson & Hunter, Edward J. Rodzewich; Hayes, Scott, Bonino, Ellingson & McLay, Mark G. Bonino and Charles E. Tillage for Defendant and Appellant.

Brady Law Group, Steven J. Brady; and Laura S. Liccardo for Plaintiff and Respondent.