Filed 12/15/15  Grasshopper House v. Bosworth CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| GRASSHOPPER HOUSE,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>BRIAN BOSWORTH et al.,<br><br>Defendants and Respondents. | B254507<br>B256365<br><br>(Los Angeles County<br>Super. Ct. No. SC116537)<br><br>ORDER MODIFYING OPINION AND DENYING PETITIONS FOR REHEARING<br><br>[CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on November 20, 2015, be modified as follows:

1.  The caption should include both appellate case numbers: B254507 and B256365.

2.  In the first section, under the heading "Introduction," the last sentence should be deleted and replaced with the following language:

We reverse on the issue of the property damage award, and vacate the related awards of prejudgment interest, attorney's fees and costs, but otherwise affirm.

3.  In the last paragraph of the opinion, under the heading "Disposition," the following sentence should be deleted:  We also vacate the award of prejudgment interest, to be recalculated following the resolution of the issue of property damages.

In its place, the following language should be inserted:

We also vacate the awards of prejudgment interest and attorney's fees and costs, to be recalculated following the resolution of the issue of property damages.

The court has received and considered Respondent's Petition for Modification or Rehearing and Appellant's Petition for Rehearing.  These Petitions are DENIED.

_____

EPSTEIN, P.J.                          WILLHITE, J.                          COLLINS, J.

2

Filed 11/20/15  Grasshopper House v. Bosworth CA2/4  (unmodified version)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| GRASSHOPPER HOUSE,<br><br>        Plaintiff and Appellant,<br><br>        v.<br><br>BRIAN BOSWORTH et al.,<br><br>        Defendants and Respondents. | B254507<br><br>(Los Angeles County<br>Super. Ct. No.SC116537) |

        APPEAL from a judgment of the Superior Court of Los Angeles County, Allan J. Goodman, Judge.  Reversed in part, remanded in part, and affirmed in part with instructions.

        Horvitz & Levy, Peder K. Batalden and Steven S. Fleischman; Law Office of Thomas A. Nitti, Thomas A. Nitti for Plaintiff and Appellant.

        Angelo & White, Alyssa Milman White for Defendants and Respondents.

**INTRODUCTION**

Plaintiff Grasshopper House LLC (Grasshopper) appeals from a judgment against it following a jury trial.  Grasshopper, which rented a home in Malibu from defendants Brian and Katherine Bosworth[1] for use as a drug and alcohol rehabilitation facility, sued the Bosworths over problems related to the property's septic system.  The jury returned a verdict in favor of the Bosworths and awarded $500,000 in property damage to Brian based on his cross-complaint.  Grasshopper raises the following issues on appeal:  (1) the trial court erroneously excluded its septic system expert; (2) several references to mediation made in front of the jury by counsel for the Bosworths constitute grounds for a new trial; (3) the jury lacked sufficient evidence to award $500,000 in property damages to Brian; and (4) the trial court erred in its calculation of prejudgment interest.   We reverse on the issue of the property damage award, and vacate the related award of prejudgment interest, but otherwise affirm.

**FACTUAL AND PROCEDURAL HISTORY**

*A.  The Lease*

Grasshopper, a licensed alcohol and drug rehabilitation facility, leases or owns several residential properties in Malibu for use as rehabilitation facilities.  It entered into a lease for the Bosworths' home on December 1, 2006.  The residence, a six bedroom, eight bathroom home, was built by the Bosworths in 2000.  Grasshopper intended to use the home as an additional alcohol and drug rehabilitation facility housing approximately six clients.

The lease term ran for three years, through December 31, 2009.  Grasshopper agreed to pay rent for 2007 in advance, at a rate of $35,000 per month, along with a $50,000 security deposit.  Monthly rent increased to $37,500 in 2008 and $40,000 in 2009.

---

[1] We refer to defendants individually by their first names to avoid confusion and mean no disrespect.

Sewage disposal on the property was managed through a septic system. The lease included a provision requiring Grasshopper to bear the cost of maintaining and repairing the system and to provide a status report on the system from an "approved septic company" twice a year.

*B. Initial Litigation and Settlement Agreement*

In late 2007, Brian discovered that Grasshopper had installed a "gray water system" underground on the property. Brian claimed this system was illegally installed and, together with Grasshopper's extreme rate of water usage at the residence, caused sewage to overflow from the septic pits and onto the public streets. Grasshopper denied that the water used by the clients and staff at the property was as high as the rate reflected in the water bills and claimed that the grey water system was an attempt to assist the already ailing septic system. As a result of the sewage overflow, the City of Malibu issued a citation and a cease and desist notice barring occupancy of the residence until the septic issue was addressed.

Shortly thereafter, the Bosworths served Grasshopper with a three-day notice to quit and the parties filed lawsuits against each other related to the problems with the septic system. Both lawsuits were resolved pursuant to a settlement agreement effective January 2, 2008. Under the agreement, Grasshopper agreed to: (1) pay an increase in rent for 2008 and 2009; (2) pay the legal fees incurred by the Bosworths from the litigation as well as fees already incurred by two septic experts, up to a specified amount; and (3) pay the first $100,000 toward the design and installation of a new septic system, plus 50% of any additional cost up to $10,000. The Bosworths agreed to handle the design and installation of the septic system and Grasshopper agreed to pay to continue pumping the existing system regularly until it was installed. The parties further agreed to dismiss the pending litigation and mutually release "all known past liabilities, claims, and causes of action except obligations expressed in the residential lease which shall remain in effect except as modified" in the settlement agreement.

*C. Continued Dispute*

Despite the settlement, the dispute between the parties continued.  Grasshopper claimed that it was pumping out the septic system several times per week, but that sewage overflowed onto the property grounds and backed up into the house, rendering some or all of the house unusable for Grasshopper's clients.

Brian claimed that he spent the latter half of 2008 consulting with experts regarding construction of a new septic system and searching for the leak in the water line that Grasshopper insisted must be causing the high water usage rate.  Brian then asked Grasshopper for an initial payment toward the new system in February 2009, but Grasshopper refused.  Grasshopper vacated the premises on March 31, 2009.  Grasshopper claimed that the delay in moving forward with installation of a new septic system, along with the anticipated repair that was estimated to take another four months and cause a "total disruption of the property," meant that it would not get any benefit from a new septic system until nearly the end of its lease term.  Grasshopper made no further rental payments and the Bosworths did not return the security deposit.

In March 2009, before Grasshopper vacated the premises, Katherine and a Grasshopper representative conducted a walk-through of the property.  The Bosworths, along with their contractor, prepared a list of repairs they contended were Grasshopper's responsibility and Katherine then conducted a second walk-through in April 2009, after Grasshopper had vacated but while its workers remained on the premises.  The Bosworths claim that Grasshopper left the home with extensive damage and modifications that were never approved under the lease; Grasshopper, for its part, asserts that it made the necessary repairs and returned the property to the Bosworths in "excellent" condition.  This action followed.

*D. Complaint and Cross-Complaint*

Grasshopper filed its complaint against the Bosworths on April 2, 2012, alleging causes of action for breach of the lease agreement, constructive eviction, and breach of contract based on a failure to return the security deposit.  In its first cause of action for breach of contract, Grasshopper alleged that the Bosworths breached the lease and

4

Settlement Agreement by "provid[ing] a septic system on the Property that was defective;" and then failing and refusing to repair the septic system "despite the repeated demands of Plaintiff that Defendants do so and despite Defendants' clear obligation to do so." Grasshopper alleged that it surrendered the property to the Bosworths on March 31, 2009 as a result of these breaches and that it suffered $54,440 in damages between January 2008 and March 2009 "related to the defective septic system and plumbing" (including the cost of septic pumping and visits by leak detection companies) and $150,000 during the same time period for loss of use of several of the bedrooms on the property. In its second cause of action for constructive eviction, Grasshopper alleged that the Bosworths' wrongful conduct related to the septic system "rendered the Property, or a material and substantial portion thereof, unfit for its intended purposes and deprived Plaintiff of the beneficial use thereof for a material and substantial period of time." In its third cause of action, Grasshopper alleged that the Bosworths breached the lease by failing to return its $50,000 security deposit or furnishing an itemized statement indicating the basis for disposition of that amount. Grasshopper further alleged that the claims in its complaint "were not extinguished by the Settlement Agreement" because they "(1) arose subsequent to the effective date of the Settlement Agreement; and/or (2) are based on obligations expressed in Lease which 'remain in effect except as modified' in the Settlement Agreement; and/or (3) are based on breaches of the Settlement Agreement."

Brian[2] filed a cross-complaint against Grasshopper in September 2012, alleging claims for breach of the settlement agreement and breach of the lease. Brian alleged that "[i]mmediately, following execution of the Settlement, [he] initiated discussions with several individuals in companies, including [Richard] Sherman, regarding the design and construction of a new septic system," but that "a study was needed to assess the Property's average daily water consumption." Brian further alleged that the "exceptionally high" rate of water usage by Grasshopper mandated "extensive repair and

_____

[2] The cross-complaint alleges that Katherine assigned her interest in the lawsuit to Brian as part of their divorce settlement.

a specially designed septic system." The cross-complaint details Brian's alleged actions between January 2008 and March 2009 toward the implementation of a new septic system as well as measures taken to locate any leaks on the property due to Grasshopper's insistence that the high water consumption was due to a leak. Brian contends that when he requested that Grasshopper submit payment toward a new system in November 2008, Grasshopper refused and then "abandoned the Property" in March 2009, "leaving it in substantial disrepair." Grasshopper failed to make any further rental payments from April 2009 through the end of the lease term in December 2009. With respect to damages, Brian alleged that the cost of repairs to "restore the Property to marketable condition" totaled "over $407,587.50" and that "the damage caused to the property by Grasshopper including [to] the septic system" reduced the sales price of the property by $1 million.

*E. Trial*

Jury trial commenced on October 22, 2013. After a seven day trial, the jury returned a verdict in favor of the Bosworths on Grasshopper's complaint. On Brian's cross-complaint, it awarded damages totaling $604,150, including $500,000 in property damage.

The court entered judgment on November 25, 2013 and denied Grasshopper's motions for new trial and for judgment notwithstanding the verdict on January 21, 2014. Grasshopper timely appealed.

**DISCUSSION**

*A. Exclusion of Grasshopper's Expert*

Grasshopper contends the trial court erred in granting the motion to exclude its expert witness and that it was prejudiced by that exclusion. We disagree and affirm.

*1. Relevant Background*

As the case approached its scheduled trial date in October, 2013, the Bosworths served a demand for exchange of expert witness information pursuant to section 2034.210. On August 26, 2013, the designated date of exchange, the Bosworths served

6

their designation pursuant to Code of Civil Procedure section 2034.260,[3] naming Lawrence Young as their expert expected to testify as to Grasshopper's liability, the damages suffered by the Bosworths, and, more specifically, regarding "the onsite water system and septic system." On the same date, Grasshopper provided a letter stating that it "does not presently intend to offer any expert testimony."

On September 16, 2013, Grasshopper served an "Expert Witness Designation" designating Richard Sherman as an expert pursuant to section 2034.260. Grasshopper's designation stated that Sherman was expected to testify as to the Bosworths' liability, the damages suffered by Grasshopper, and, more specifically, regarding "the onsite water system and septic system."[4]

On September 24, 2013, the Bosworths filed a motion in limine to exclude expert testimony by Sherman, on the grounds that Grasshopper "waited until after it had the opportunity to review" the Bosworths' expert designation before designating Sherman to "testify regarding issues that it knew would be highly disputed [] at trial." Grasshopper filed an objection the following day, September 25, 2013, stating that the motion was untimely, as it should have been filed no later than September 12, 2013 in order to be heard at the final status conference.[5] As a result of the belated filing, Grasshopper complained that it had "no time to research and write any opposition on the merits."[6]

---

[3] Statutory references herein are to the Code of Civil Procedure unless otherwise indicated.

[4] Although Grasshopper's designation is treated by both parties as a purported supplemental designation under section 2034.280, it was not labeled as such and states that the designation was made pursuant to section 2034.260, the section governing the initial designation of expert witness information.

[5] Grasshopper ignores the fact that the Bosworths could not have moved to strike the supplemental expert designation on or before September 12, since Grasshopper did not even serve that designation until September 16, 2013.

[6] It appears from the record that Grasshopper also moved in limine to exclude certain experts designated by the Bosworths or to strike their supplemental expert designation. The court granted Grasshopper's motion, but the record on appeal does not contain any information regarding which experts designated by the Bosworths were excluded. As discussed further below, Young testified as an expert for the Bosworths at trial.

7

At the final status conference on October 4, 2013, the court granted the motion and excluded expert testimony by Sherman at trial.

### 2. *Legal Principles*

"The Supreme Court has noted that the need for pretrial discovery is greater with respect to expert witnesses than ordinary fact witnesses because the opponent must prepare to cope with the expert's specialized knowledge." (*Boston v. Penny Lane Centers, Inc*. (2009) 170 Cal.App.4th 936, 951(*Boston*) [citing *Bonds v. Roy* (1999) 20 Cal.4th 140, 147].) "The Legislature responded to this need by enacting detailed procedures for discovery pertaining to expert witnesses." (*Boston, supra*, at p. 951; [citing § 2034.210 et seq.].)

Pursuant to section 2034.210, any party may issue a demand for the "mutual and simultaneous exchange by all parties" of expert witness information. On or before the date of exchange, each party must provide either: "(1) A list setting forth the name and address of any person whose expert opinion that party expects to offer in evidence at the trial;" or "(2) A statement that the party does not presently intend to offer the testimony of any expert witness." (§ 2034.260.) The provision of "supplemental expert witness list" is governed by section 2034.280, which provides that "[w]ithin 20 days after the exchange described in Section 2034.260, any party who engaged in the exchange may submit a supplemental expert witness list containing the name and address of any experts who will express an opinion on a subject to be covered by an expert designated by an adverse party to the exchange, if the party supplementing an expert witness list has not previously retained an expert to testify on that subject."

Failure to comply with these requirements can have drastic consequences. "[O]n objection of any party who has made a complete and timely compliance with Section 2034.260, the trial court shall exclude from evidence the expert opinion of any witness that is offered by any party who has unreasonably failed to do any of the following: [¶] (a) List that witness as an expert under Section 2034.260. . . ." (§ 2034.300.)

We generally review the trial court's ruling on a motion to exclude expert testimony for abuse of discretion, including its determination that a party "unreasonably"

8

failed to comply with an expert witness demand. (*Boston, supra*, 170 Cal.App.4th at p. 952.) "A trial court's discretion is always delimited by the statutes governing the particular issue but when the exclusion of expert testimony rests on a matter of statutory interpretation, we undertake a de novo review. [Citations.]" (*Staub v. Kiley* (2014) 226 Cal.App.4th 1437, 1445.)

Here, Grasshopper argues that the de novo standard applies, suggesting that the issue is not a discretionary exclusion of an expert under section 2034.300. Rather, Grasshopper contends it raises "a pure issue of law" as to whether a trial court may "exclude a properly designated *supplemental* expert on the ground that the expert should have been designated in a party's *original* expert witness disclosure." The cases Grasshopper cites required statutory interpretation and are inapplicable to the facts of this case. (See *Staub v. Kiley, supra*, 226 Cal.App.4th at pp. 1445-1446 [de novo review of defendant's standing under discovery statutes to seek to exclude plaintiffs' experts, but review for abuse of discretion of reasonableness of plaintiffs' failure to comply with expert exchange]; *Gonsalves v. Li* (2015) 232 Cal.App.4th 1406; 1414 [de novo review of whether discovery statutes permit introduction at trial of qualified denials contained in responses to requests for admission].)

At bottom, Grasshopper's challenge does not require an interpretation of the discovery statutes; rather, Grasshopper asks us to examine the trial court's reasonableness determination and argues that it complied with section 2034.260 by providing a letter tracking the statutory language. While Grasshopper contends that Sherman was properly designated as a supplemental expert, his exclusion from trial was based on the Bosworths' motion (and the trial court's subsequent order) arguing that he should have been listed in the initial expert exchange. As such, abuse of discretion review is appropriate.[7]

---

[7] We note, however, that we would reach the same conclusion under a de novo review.

### 3. *Forfeiture*

The Bosworths contend that by failing to substantively oppose their motion in the trial court, Grasshopper forfeited its right to challenge the exclusion of its expert on appeal. Grasshopper acknowledges that its only objection below to the motion to exclude Sherman was that the motion was untimely. But Grasshopper contends that it raises a question of law based on undisputed facts, which can be asserted for the first time on appeal.

As discussed above, we disagree with Grasshopper's characterization of the issue as a question of law. In particular, where, as here, Grasshopper argues that it is entitled to a new trial due to the prejudice suffered from exclusion of its expert, it was Grasshopper's burden to make a sufficient offer of proof regarding the reasonableness of its expert witness disclosures and the lack of any gamesmanship or misconduct to allow the trial court to conduct a full evaluation before ruling on the motion in limine. (See, e.g., Evid. Code § 354, subd. (a) [judgment may not be set aside due to erroneous exclusion of evidence unless the "substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means"]; *Gordon v. Nissan Motor Co., Ltd.* (2009) 170 Cal.App.4th 1103, 1114 [ordering new trial where plaintiff "gave the court sufficient notice of the substance, purpose and relevance of the proposed expert witness testimony for the court to understand the impact of its ruling on Nissan's motion to strike"].) Grasshopper did not do so, and therefore forfeits the right to raise this objection on appeal.[8]

---

[8] We also reject Grasshopper's suggestion that the rules of forfeiture should not apply because the Bosworths' motion in limine was untimely and Grasshopper had inadequate time to "have researched and fully briefed" a substantive opposition. As noted above, by the time Grasshopper served its supplemental expert disclosure, the deadline for properly-noticed motions in limine had passed. (§ 1005, subd. (b); Los Angeles Superior Court Rule 3.25(f)(2).) Moreover, while it is understandable that Grasshopper would want to file its opposition as quickly as possible and felt it did not have time to "fully brief[]" the substantive issues, it has not demonstrated that it made *any* attempt to even raise the possibility of a substantive objection—neither in the written opposition it filed on September 25, 2013, nor at the hearing on the motion held over a

10

*4. Determination that Grasshopper Unreasonably Failed to Comply With Expert Disclosure Statutes*

Moreover, even if we were to reach the merits, we would find no error in the trial court's exclusion of Grasshopper's expert. The Bosworths relied on *Fairfax v. Lords*, *supra*, 138 Cal.App.4th at p. 1019 in support of their motion to exclude Grasshopper's expert. In *Fairfax*, a medical malpractice action, the defendant physician responded to the demand for exchange of expert witness information with a document stating he "'hereby gives notice that he is not designating any retained experts for the first exchange of expert witness information'" but that he "'expressly reserves the right to designate experts in rebuttal to [Fairfax's] designations.'" (*Id*. at p. 1022.) Plaintiff designated a physician expert witness. (*Ibid*.)

Defendant then served a "'Second Designation of Expert Witnesses'" naming two newly retained experts (presumably pursuant to section 2034.280) to counter the expected testimony of plaintiff's expert. (*Fairfax, supra*, at p. 1023.) Plaintiff moved to strike, arguing that compliance with the standard of care was a key issue in a medical malpractice case, and that defendant could not "avoid a simultaneous exchange by labeling his expert on that key issue as merely a 'rebuttal' witness." (*Ibid*.) In opposing plaintiff's motion, defendant's counsel did not dispute that he waited to designate any defense experts until he saw plaintiff's initial designation. (*Ibid*.)

The Court of Appeal held that defendant had violated the requirement of a "'simultaneous exchange'" of expert information set forth in section 2034.[9] (*Id*. at p. 1026-1027.) Defendant's initial expert witness exchange "did neither of the things required by [section 2034.260]—it neither listed any experts that he 'expected' to call as

week later, nor in its post-trial motion seeking a new trial. We also note that counsel for the Bosworths raised substantive objections to Grasshopper's designation, including a citation to *Fairfax v. Lords* (2006) 138 Cal.App.4th 1019 (*Fairfax*), in a meet and confer letter sent to Grasshopper's counsel on September 19, 2013, five days before the Bosworths filed their motion.

[9] The expert witness discovery provisions in sections 2034.210 through 2034.310 were previously codified in section 2034, subdivisions (a) through (m). The relevant language remains unchanged.

witnesses, nor did it state that he had no present intention to offer expert testimony. . . . The effect of Lords' expert designation was to delay his own list of 'expected' witnesses until after he had seen the list put forth by Fairfax." (*Id*. at pp. 1025-1026.) That conduct was "simply inconsistent with the clear statutory requirement of a 'simultaneous' exchange." (*Id*. at p. 1026.) The court further rejected defendant's contention that he could not determine what claims were at issue until he reviewed plaintiff's expert witness list, noting that plaintiff had designated an expert to address "the only real disputed issue in this case—i.e., whether Lords' treatment of Fairfax complied with the standard of care. Because Lords had every reason to anticipate such a designation, he had a corresponding obligation to designate whatever expert he expected to have testify on the issue *at the same time. . . .* Our system requires that defendants participate in the litigation essentially simultaneously with plaintiff. Section 2034 *expressly* requires it with respect to expert designations." (*Id*. at pp. 1026-1027.)

Similarly, here, Grasshopper did not designate any expert on the date of the initial expert exchange, and waited until the last day permissible for identification of a supplemental expert witness (the Monday following the 20th day after the initial exchange) to identify Sherman as an expert expected to testify as to liability, damages, and the property's water and septic systems. In effect, Grasshopper avoided the requisite simultaneous exchange of expert witness information, only to then designate Sherman, an expert in support of its affirmative claims, as a purported rebuttal witness. Under those circumstances, it was not error for the trial court to conclude that Grasshopper unreasonably failed to designate Sherman as an expert in the initial exchange and therefore to exclude his testimony under section 2034.300.

Grasshopper attempts to distinguish *Fairfax* by noting in that case, the defendant's initial response did not adhere to the language set out in section 2034.260, while Grasshopper's initial response did. In essence, Grasshopper suggests that because its initial response was timely and recited the statutory language, the trial court lacked discretion to consider whether the rebuttal designation of Sherman was improper.

12

We disagree, in light of the concerns regarding fair and simultaneous expert disclosure articulated in *Fairfax* and similar cases, and the discovery statutes themselves. (See *Fairfax, supra*, 138 Cal.App.4th at pp. 1026-1027; *Bonds v. Roy, supra*, 20 Cal.4th at pp. 146-147 ["the very purpose of the expert witness discovery statute is to give fair notice of what an expert will say at trial. . . . 'Late disclosure of experts . . . frustrates the very purposes of the discovery statutes, and should be permitted, with appropriate safeguards and limits, only when absolutely necessary to avoid a miscarriage of justice.' [Citation.]"].) Grasshopper cites no authority suggesting that a court lacks discretion to consider whether a party should have named an expert in its initial response to a demand, rather than waiting for its opponent's disclosures, as part of the reasonableness determination for potential exclusion under section 2034.300.

Moreover, the cases cited by Grasshopper arise under different circumstances, as each involves instances where a party named experts in its initial disclosure and then provided supplemental disclosures that included additional experts. For example, while Grasshopper claims that "[r]oughly the same sequence of events occurred" in *Kennedy v. Modesto City Hospital* (1990) 221 Cal.App.3d 575, it ignores the fact that the plaintiff in that case named several experts in her initial expert disclosure and then designated a rebuttal expert upon whom she relied in opposing summary judgment. (*Id*. at p. 577.) Thus, while the court, in dicta, suggested that it "seriously doubt[ed]" that exclusion of the rebuttal expert's declaration was correct, it did not do so in the context of the issue presented here, namely, a plaintiff who declines to initially designate any expert and then purports to designate a rebuttal expert on key issues. (*Id*. at p. 580, fn. 3.)

Here, the record supports the conclusion that Grasshopper should have initially disclosed Sherman as an expert witness pursuant to section 2034.260. Grasshopper contends that "the issues with the septic system were resolved by the settlement agreement" and it needed only to present evidence at trial to show Brian unreasonably delayed in installing the new system; thus, it "did not require expert testimony" to support its claims until it discovered that the Bosworths planned to litigate the septic system issues at trial. But Grasshopper's claim is belied by the allegations of its own

13

complaint and the language of its expert disclosure. Specifically, Grasshopper's complaint alleged that the Bosworths breached the lease by "provid[ing] a septic system on the Property that was defective" and sought damages "related to the defective septic system and plumbing." Grasshopper continued to allege at trial that the septic system had a "pre-existing" condition that caused it to fail. And Grasshopper's expert disclosure broadly designated Sherman to testify as to the Bosworths' liability and Grasshopper's damages, as well as more specifically regarding the water and septic systems. Therefore, Grasshopper cannot divorce its affirmative claims from the septic system issues. As witnesses for both parties testified, a determination of whether Brian acted reasonably regarding installation of the new system would necessarily include evidence related to the reasons behind the high water consumption rate on the property and measures needed to design a system that could accommodate Grasshopper's use. As such, we find no error in the trial court's exclusion of Sherman based on Grasshopper's failure to timely designate him as an expert.[10]

### B. References to Mediation

Grasshopper claims that counsel for the Bosworths improperly referred to the parties' prior mediation in front of the jury and that such references must result in a new trial. We conclude that Grasshopper has forfeited its right to raise this issue for the first time on appeal, and, in any event, that the references to mediation here do not warrant a new trial.

### 1. Relevant Background

The lease contained a mediation provision requiring the parties to pursue mediation in order to seek attorneys' fees in any subsequent litigation. The parties held a mediation in mid-2012, after Grasshopper filed the instant lawsuit. During trial, the

---

[10] Even if the exclusion was in error, we agree with the Bosworths that Grasshopper has failed to demonstrate that the error was sufficiently prejudicial to warrant a new trial. In particular, several of Sherman's reports regarding his findings were offered as evidence during the trial. Further, despite Sherman's involvement with the property, Grasshopper did not attempt to call him as a percipient witness to testify to his direct observations of the problems with the water and septic systems.

14

Bosworths elicited testimony from several witnesses regarding the date, location and identity of the attendees of the mediation. Further, during closing argument, counsel for the Bosworths argued that Brian waited to file his lawsuit against Grasshopper based on the understanding that the parties were going to mediate the case, but that Grasshopper filed its lawsuit prior to the mediation, "maybe . . . to get a head start or maybe . . . to look like the first person to sue." Grasshopper did not object to this evidence or argument and there was no discussion at trial regarding the substance of the mediation.

### 2. *Legal Principles*

"In order to encourage the candor necessary to a successful mediation, the Legislature has broadly provided for the confidentiality of things spoken or written in connection with a mediation proceeding." (*Cassel v. Superior Court* (2011) 51 Cal.4th 113, 117 (*Cassel*); see also *Foxgate Homeowners' Assn. v. Bramalea California, Inc*. (2001) 26 Cal.4th 1, 14 [confidentiality is essential to effective mediation].) The statutory scheme for mediation confidentiality, Evidence Code sections 1115 to 1128, therefore protects "the confidentiality of mediation proceedings, with narrowly delineated exceptions." (*Simmons v. Ghaderi* (2008) 44 Cal.4th 570, 574 (*Simmons*).)

Pursuant to Evidence Code section 1128, "[a]ny reference to a mediation during any subsequent trial is an irregularity in the proceedings of the trial for the purposes of Section 657 of the Code of Civil Procedure." Section 657 permits granting of a new trial based on an "[i]rregularity in the proceedings of the court, jury or adverse party, . . . by which either party was prevented from having a fair trial" and where such incident "materially affect[s] the substantial rights of" the aggrieved party.

Both parties urge interpretation of the scope of phrase "[a]ny reference to a mediation" in Evidence Code section 1128. Grasshopper argues for a broad interpretation and contends that the necessity of such statutory interpretation requires a de novo standard of review. The Bosworths argue that we should interpret Evidence Code section 1128 to bar references at trial only to "the narrow category of mediation-related communications." We need not resolve this issue, as even assuming all of the references to mediation here fall within the ambit of the statute, we conclude that none of them

15

qualified as an "irregularity" sufficient to warrant a new trial. As such, no statutory interpretation is necessary and we review the admission of evidence regarding mediation for an abuse of discretion. (*People v. Williams* (1997) 16 Cal.4th 153, 196–197; *Pannu v. Land Rover North America, Inc*. (2011) 191 Cal.App.4th 1298, 1317.)

### 3. Forfeiture of Issue on Appeal

Grasshopper argues, for the first time on appeal, that the trial court erred in allowing statements and evidence at trial related to the mediation. By failing to object to the testimony or argument regarding mediation below, Grasshopper forfeited this issue on appeal. (Evid. Code, § 353, subd. (a).) To obtain reversal based on the erroneous admission of evidence, defendant must show a timely objection making "clear the specific ground of the objection. . . ." (*Ibid*.; *Duronslet v. Kamps* (2012) 203 Cal.App.4th 717, 725-726.) "Lack of such objection deprives the proponent of the evidence an opportunity to establish a better record or some alternative basis for admission," and deprives the trial court of the ability to rectify any error. (*Duronslet v. Kamps, supra,* 203 Cal.App.4th at p. 726.)

Grasshopper admits that it did not raise this issue before the trial court, either during trial or as part of its motion for new trial. Instead, it relies on *Simmons v. Ghaderi*, *supra,* 44 Cal.4th at p. 570, for the proposition that forfeiture principles do not apply to mediation confidentiality. In *Simmons*, the parties reached an oral settlement agreement during mediation, and the plaintiffs sought to introduce evidence of the agreement in a subsequent action for breach of contract. The Court of Appeal held that the defendant was estopped from asserting mediation confidentiality at trial because she had failed to object to evidence of the mediation during pretrial proceedings and relied on such evidence in a motion for summary judgment. (*Id*. at p. 577.) The Supreme Court reversed, holding that a party cannot "impliedly waive mediation confidentiality through litigation conduct" and therefore that "mediation confidentiality is to be strictly enforced" absent "express waiver or where due process is implicated." (*Id*. at pp. 582, 585-588.)

In attempting to apply *Simmons* to the instant case, Grasshopper blurs the distinction between waiver, referring to "a party's intentional relinquishment or

16

abandonment of a known right or privilege," and forfeiture, referring to "the loss of a right resulting from the failure to assert it in a timely fashion." (*Smith v. Adventist Health System/West* (2010) 182 Cal.App.4th 729, 739, fn. 7.) The court in *Simmons* was concerned with the defendant's ability to rely on the confidentiality of mediation communications and therefore bar introduction of mediation communications as evidence at trial. The Supreme Court held that she did not impliedly waive that confidentiality by her prior litigation conduct. Here, on the other hand, Grasshopper raised mediation confidentiality for the first time on appeal, leaving no opportunity for the Bosworths or the trial court to address the purported problem. Grasshopper has therefore forfeited its right to assert error on appeal.[11]

### 4. *References to Mediation Do Not Require New Trial*

While the forfeiture issue is dispositive, we also reject Grasshopper's argument on the merits and conclude that the references to mediation did not warrant a new trial.

Ignoring the requirements of section 657, Grasshopper makes no attempt to show how the references to mediation here "materially affected [its] substantial rights" and prevented it from having a fair trial. Instead, Grasshopper suggests that "[a]ny reference to a mediation warrants a new trial." However, none of the cases Grasshopper cites support that contention. All of those cases involve attempts to use the substance of a mediation as evidence in subsequent proceedings. (See *Simmons, supra*, 44 Cal.4th at pp. 585-588; *Foxgate Homeowners' Assn. v. Bramalea California, Inc.*, *supra*, 26 Cal.4th at pp. 3-4 [vacating sanctions order based on mediator's report of conduct during mediation]; *Amis v. Greenberg Traurig LLP* (2015) 235 Cal.App.4th 331, 333 [barring malpractice plaintiff from introducing evidence of former attorney's acts or omissions during mediation].) Grasshopper provides no authority suggesting that a handful of references to the logistics of a mediation would prevent a party from having a fair trial,

---

[11]The Bosworths' argument that Grasshopper waived its mediation confidentiality by affirmatively questioning witnesses regarding mediation logistics at trial is squarely covered by *Simmons*, since Grasshopper never expressly waived mediation confidentiality. This argument is therefore without merit.

and makes no showing that such was the case here. We therefore conclude that no error occurred.

### C. Property Damage Award

Grasshopper contends that the jury's award of $500,000 in property damage to Brian was not supported by substantial evidence. We agree.

#### 1. Relevant Background

During trial, the Bosworths offered testimony of several witnesses regarding the damage they claimed Grasshopper caused to the property. In response to a question regarding why he did not immediately attempt to re-rent the property, Brian estimated "it would be somewhere close to half a million dollars to put it back in the condition that it would be rentable." He also testified that it would cost $3,000 to replace a tree that Grasshopper cut down.

Katherine testified as to a number of repairs that were done before she resumed living in the home, including repairing the entry gates and phone system, cleaning the pool and spa, repairing garage doors, and landscaping, totaling $10,000. She also gave estimates as to the cost of other items, based on costs when the Bosworths first moved into the house, such as repainting the interior, staining and sealing all of the hardwood floors, and recarpeting. In total, Katherine provided dollar amounts for approximately $255,000 in repairs. Mr. Young, the septic system expert for the Bosworths, also testified that it would cost an estimated $100,000 to install a new septic system.

Daniel Gottlieb, who owns a real estate company, purchased the property from the Bosworths in early 2011. Gottlieb testified that he toured the property in summer of 2009 and early fall of 2010. He received estimates regarding the cost of repairs from a landscaper, an electrician and a general contractor and used those estimates in determining his purchase price offer on the house. The court sustained Grasshopper's hearsay objection as to the amounts of the estimates. Gottlieb stated that he also received disclosures from Brian.

Ultimately, Gottlieb paid $6,050,000 for the property. Over Grasshopper's objection, he testified that, based on his real estate experience and the information he was

given, he felt the property "needed very close to a million dollars' worth of repair. So I took that off of my calculations off of what I felt it was worth [sic]." He also testified about some of the needed repairs: staining and re-sanding wood floors, painting "inside and out," stucco work, landscaping, tile work, repairing and replacing fixtures, and repairs to the pool, which was in "bad shape." He also had to "do a lot of work" to repair the septic system. He gave no other dollar figures.

In closing, Bosworths' counsel argued that Gottlieb's estimate was evidence of the reduction in value of the property. Alternatively, she cited testimony by the Bosworths supporting cost of repair. She itemized about $225,000 worth of damages, but then estimated that the total cost of repairs was "in the range of" $700,000 to $1.3 million.

The jury was instructed pursuant to CACI No. 3903F that it could award damages to Brian for harm to the property in the amount of "the reduction in the property's value or the reasonable cost of repairing the harm." In the event the jury found evidence of both, it was instructed to award the "lesser of the two amounts." The jury awarded Brian $500,000 in property damage and no amount for diminution in value. When polled, jurors confirmed that they had determined that the diminution in value was greater than $500,000, therefore, they did not award damages in that category.

### 2. Standard of Review

We review a challenge to the sufficiency of the evidence in support of the verdict under the substantial evidence standard. (*Lenk v. Total-Western, Inc.* (2001) 89 Cal.App.4th 959, 968.) "'"[T]he power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted," to support the findings below. [Citation.] We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor. . . .' [Citation.]" (*Thompson v. Tracor Flight Systems, Inc.* (2001) 86 Cal.App.4th 1156, 1166.)

### 3. Evidence of Property Damage

The parties agree that the jury was properly instructed that it could award property damages based on the reduction in fair market value or the cost of repairs, whichever was

19

less. Grasshopper contends that the record lacks evidence to support the jury's award of $500,000 in repairs; specifically, Grasshopper takes issue with the testimony of Gottlieb, Brian, and Katherine in support of the damages award.

First, Grasshopper acknowledges that Gottlieb, as the owner, could testify as to the value of the property under Evidence Code section 813; on the other hand, it argues that Gottlieb's testimony cannot be considered evidence in support of an award for cost of repairs. Over Grasshopper's objection, Gottlieb claimed that the fair market value of the property was reduced by $1,000,000, based on his estimate of the cost of repairs (which, in turn, was based on estimates received from others). Although he was a real estate professional, Gottlieb was not designated as an expert at trial, nor did he offer any evidence regarding the cost of repairs he actually performed.

Evidence Code section 813 permits an opinion on the value of a property offered by either a qualified expert witness or the owner. "It is also the law that having expressed an opinion as to the value of his property, the owner should be permitted to give his reasons for such opinion, since it is the general rule that an opinion is worth no more than the reasons on which it is based. (*Long Beach City High School Dist. v. Stewart* (1947) 30 Cal.2d 763, 772-773; *People v. Nahabedian* (1959) 171 Cal.App.2d 302, 309.)" (*Kitchel v. Acree* (1963) 216 Cal.App.2d 119, 124.) "However, '[i]n stating his opinion as to the value of property, the owner is bound by the same rules of admissibility of evidence as is any other witness.' [Citation.]" (*Ibid.*) Thus, for example, courts have refused to allow a property owner to introduce hearsay evidence, such as a repair estimate received from a third party, under the guise of offering that information as a basis for the owner's opinion on the value of the property. (See *id.* at p. 125 [testimony of homeowner concerning cost to repair defective work was based upon inadmissible hearsay estimate from plastering contractor]; *Garfinkle v. Montgomery* (1952) 113 Cal.App.2d 149, 158-159 [trial court properly excluded lessor's damage testimony based on repair estimate that was "pure hearsay"].) Similarly, Evidence Code section 813 does "not extend to the giving of testimony as to the cost of repairs, especially where such testimony is merely a repetition of the statements of other persons to the witness.' [*Le Brun v. Richards* (1930)

20

210 Cal. 308 at pp. 319-320.].'" (*McCoy v. Gustafson* (2009) 180 Cal.App.4th 56, 111, fn. 26 [property owner claimed that she should have been able to read construction company's excavation estimate to jury].)

Here, Gottlieb's testimony was couched as valuation testimony pursuant to Evidence Code section 813. But he should have been precluded from offering an opinion as to the cost of repairs, as he was not qualified as an expert and his repair testimony was premised on inadmissible hearsay evidence. Although the Bosworths reference the broad premise that a party may rely on properly admitted evidence of the cost of repairs, they cite no case permitting lay witness testimony of the cost of repairs under Evidence Code section 813. Moreover, even if Gottlieb's million dollar figure was admissible evidence of the reduction in the property's value under Evidence Code section 813, there was no basis to admit that same testimony as evidence of the cost of repairs. Tellingly, in her closing argument, counsel for the Bosworths tied Gottlieb's estimate only to an award for reduction in value, not cost of repairs. Thus, the Bosworths cannot rely on Gottlieb's estimate to support the jury's $500,000 award for property damage.

Next, Grasshopper argues that Brian's testimony was too conclusory to support a property damage award. We agree. While Brian's testimony certainly established his familiarity with the property and knowledge of the alleged damages to it, he provided no details about how he reached the $500,000 estimate for repairs. Moreover, Brian was not qualified as an expert and did not testify as to the cost of repairs actually made. (See *People v. Southern Cal. Edison Co.* (1976) 56 Cal.App.3d 593, 606 [expense report showing cost of repair was sufficient to satisfy plaintiff's burden "to prove the elements of its damage with reasonable certainty"]; *Smith v. Hill* (1965) 237 Cal.App.2d 374, 388 ["If repairs have in fact not been made, the estimated cost of repairs reasonably necessary calls for expert testimony. [Citation.]"].) As such, his testimony estimating the cost of

21

repair at $500,000 was an insufficient basis for the jury's award, particularly where, as here, that testimony lacked corroboration from any other evidence in the record.[12]

Finally, absent the estimates from Gottlieb and Brian, Grasshopper contends that there is insufficient evidence in the record to support an award of $500,000 in cost of repair damages. Grasshopper disputes the validity and admissibility of some of the repairs claimed by the Bosworths, arguing, for example, that Katherine's testimony about the initial cost to install carpeting and wood floors throughout the house was not relevant to the cost to repair any damage by Grasshopper. But even assuming all of the items were admissible to prove cost of repairs, the total amount for which there was evidentiary support is, at most, $358,000. The Bosworths point to the general evidence regarding the condition of the house after Grasshopper vacated it, including photographs and a video, and suggest that the jury had a sufficient basis to reach the $500,000 amount. But the Bosworths have never—not at trial during presentation of evidence or closing and not in their brief on appeal—been able to articulate specifically how they sustained $500,000 or more in cost of repair damages. As such, they failed to provide sufficient evidence to support the jury award and reversal is warranted.

D. Award of Prejudgment Interest

Grasshopper also challenges several aspects of the trial court's award of prejudgment interest to Brian. Although the precise calculation issues are now moot, given our reversal of the $500,000 property damage award herein, we nevertheless briefly discuss the issues raised by Grasshopper for the guidance of the court and the parties upon remand.

---

[12] The Bosworths contend that Grasshopper waived its right to challenge Brian's testimony by failing to object or move to strike his response at trial. We need not reach this issue—even assuming Grasshopper was barred from challenging the admissibility of Brian's statement estimating $500,000 in repairs, it may still contend, as it does here, that Brian's statement alone was insufficient evidence to support the jury's property damage award for that amount.

## 1. Relevant Background

As discussed above, the jury awarded $500,000 to Brian for property damages. The jury also awarded him $88,500 in lost rent, $2,125 in late fees, and $13,500 for insurance (reflecting the increase in the Bosworths' insurance premiums from Grasshopper's use of the property).

Following the trial, the Bosworths submitted a motion for attorney fees and costs, including a request by Brian for prejudgment interest. Brian claimed that the following amounts were liquidated damages under Civil Code section 3287(a): $104,125 for lost rent, late fees and insurance, as well as $115,000 of the $500,000 property damage award for septic system damages.[13] He calculated prejudgment interest for this amount starting on March 31, 2009, the date Grasshopper vacated the property and thereby breached the lease agreement. Additionally, Brian contended that the remaining property damage amount was subject to prejudgment interest as of February 28, 2012. On that date, the Bosworths sent a settlement proposal to Grasshopper, including a sheet of "estimated damages" listing $110,000 in septic system damages and $407,587.50 for "other damage to property." The letter also attached an itemized proposal dated October 10, 2011 with a breakdown of the repairs included in the latter amount. In total, Brian requested $173,078.95 in prejudgment interest.[14]

In a minute order issued March 10, 2014, the court set the date for calculating prejudgment interest as February 28, 2012, "as that is the date for which defense counsel provided calculations." The court then awarded $173,078.95 in prejudgment interest, the entire amount requested by Brian. Grasshopper filed a motion to correct the award, noting that the court had set February 28, 2012 as the date for calculation of all prejudgment interest, but then adopted the calculations done by Brian, which used March 31, 2009 as the date for a portion of the interest requested and February 28, 2012 for the

---

[13] The $115,000 calculation is based on the maximum amount Grasshopper agreed to pay for a new septic system under the settlement agreement.

[14] Brian originally requested $174,967.07 in prejudgment interest. He then submitted a supplemental brief, based on the same numbers, recalculating the interest due as $173,078.95. The parties do not otherwise challenge these calculations on appeal.

23

remainder.  On May 8, 2014, the court amended its prior minute order nunc pro tunc, changing the start date for all prejudgment interest calculations to March 31, 2009.  The court offered no explanation for why it used March 31, 2009 as the date for the entire amount, a result requested by neither of the parties.  Grasshopper timely appealed the court's order awarding prejudgment interest.  We consolidated this appeal with Grasshopper's earlier appeal.

### 2. Legal Principles

An award of prejudgment interest is governed by Civil Code section 3287. Subsection (a) provides for interest on liquidated damages:  "A person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in the person upon a particular day, is entitled also to recover interest thereon from that day. . . ."  Two competing policies provide the framework for an award of prejudgment interest under the statute.  First, "interest traditionally has been denied on unliquidated claims because of the general equitable principle that a person who does not know what sum is owed cannot be in default for failure to pay." (*Chesapeake Industries, Inc. v. Togova Enterprises, Inc*. (1983) 149 Cal.App.3d 901, 906 [citing *Cox v. McLaughlin* (1888) 76 Cal. 60, 67] (Chesapeake).)  "Thus, no prejudgment penalty is assessed against a litigant for failing to pay a sum which is unascertainable prior to judgment.  [Citation.]"  (*Ibid*.)  On the other hand, the countervailing policy instructs that parties should be compensated for the loss of the use of their money during the period between the accrual of a claim and the rendition of judgment, resulting in a "generally liberal construction of 'certainty' under section 3287."  (*Ibid*. [citations omitted].)  As a result, the test for recovery under this section focuses on "'whether *defendant* actually know[s] the amount owed or from reasonably available information could the defendant have computed that amount.  [Citation.]'"  (*Children's Hospital and Medical Center v. Bontá* (2002) 97 Cal.App.4th 740, 774 *(Children's Hospital)*.)  Interest may not be awarded under this section "where the amount of damage, as opposed to the determination of liability, 'depends upon a judicial determination based upon conflicting

24

evidence and it is not ascertainable from truthful data supplied by the claimant to his debtor.' [Citations.]" (*Ibid.*)

### 3. Interest Award Issues Raised By Grasshopper

Grasshopper first contends that the trial court improperly awarded prejudgment interest on $110,000 in septic system damages, when that amount was never awarded by the jury. The Bosworths argue that the amount of septic system damages was made certain under the settlement agreement, as Grasshopper agreed to pay up to $115,000 toward a new septic system. The Bosworths further claim that the evidence presented at trial "clearly shows that the jury came to the property-damage award by taking into consideration the septic-system damage."

Ultimately, this issue is moot, as the entire property damage award is subject to retrial. But we note that the Bosworths' argument here lacks merit. There was certainly evidence at trial to support an award for septic system damages in the amount the Bosworths claim, had the jury specified such an award. But there is no indication in the record to establish what part, if any, of the lump sum of $500,000 the jury awarded for property damages was attributed to septic system damages. The special verdict form did not contain a separate section for septic system damages and the jury made no mention of that particular category of damages in its award. As such, any future award for prejudgment interest based on septic system damages must be supported by a finding of damages relating specifically to the septic system.[15]

Second, the parties disagree regarding the appropriate start date for calculating interest on the property damage award. Grasshopper contends that these damages were unliquidated as they were "vigorously disputed" and interest should therefore be calculated as of the date of Brian's cross-complaint, September 17, 2012, under Civil

---

[15] We do not reach the issue of whether and what amount of septic system damages might properly be claimed as liquidated as of the date of the contract breach.

25

Code section 3287(b).[16] The Bosworths claim that the amount of property damage was made certain as of February 28, 2012, when they provided an itemized proposal in their settlement letter. We agree. As noted above, interest is available under section 3287(a) where a defendant "actually knows the amount owed or from reasonably available information could . . . have computed that amount. [Citation.]'" (*Children's Hospital, supra,* 97 Cal.App.4th at p. 774; see also *Esgro Cent., Inc. v. General Ins. Co.* (1971) 20 Cal.App.3d 1054, 1060-61 ["Damages are deemed certain or capable of being made certain within the provisions of subdivision (a) of section 3287 where there is essentially no dispute between the parties concerning the basis of computation of damages if any are recoverable but where their dispute centers on the issue of liability giving rise to damage. [Citations.]."]; *Continental Bank v. Blethen* (1970) 7 Cal.App.3d 178, 187 ["[T]he fact that the obligor denies any liability at all does not make the damages uncertain within the meaning of section 3287."].) While the parties here vigorously disputed who was liable for damages to the property, the itemized estimate provided by the Bosworths on February 28, 2012 gave Grasshopper the information needed to compute the amount of those damages.

Finally, Grasshopper argues that, even if the itemized proposal could otherwise "start the clock" on prejudgment interest, the trial court could not rely on it here as it was part of a confidential settlement communication. Evidence Code section 1152 prohibits admission of settlement offers for the purpose of proving liability. However, as the trial court here found, the repair estimate was not offered to prove liability, but rather the date on which the amount of property damages alleged by Brian was reasonably ascertainable. As Grasshopper acknowledges, settlement communications are admissible for purposes other than proof of liability. (See *Volkswagen of Am., Inc. v. Superior Court* (2006) 139 Cal.App.4th 1481, 1491 [Evidence Code section 1152 is not an "absolute bar[] to

---

[16] Civil Code section 3287(b) provides: "Every person who is entitled under any judgment to receive damages based upon a cause of action in contract where the claim was unliquidated, may also recover interest thereon from a date prior to the entry of judgment as the court may, in its discretion, fix, but in no event earlier than the date the action was filed."

admissibility, since a settlement document may be admissible for a purpose other than proving liability"].) Grasshopper provides no authority to support the proposition that the settlement letter was inadmissible on the issue of when damages were ascertainable, and we conclude that the trial court did not err in admitting that evidence.

## DISPOSITION

That portion of the judgment awarding $500,000 in property damages to Brian Bosworth is reversed. We remand for a limited retrial or alternative resolution on the issue of property damages as claimed in Brian's cross-complaint, in accordance with the views herein expressed. We also vacate the award of prejudgment interest, to be recalculated following the resolution of the issue of property damages. In all other respects the judgment is affirmed. The parties shall bear their own costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


EPSTEIN, P. J.


WILLHITE, J.